******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MICHAEL SKAKEL *v.* COMMISSIONER
OF CORRECTION
(SC 19251)

Palmer, Zarella, Eveleigh, McDonald, Espinosa,
Robinson and Vertefeuille, Js.*

*Argued February 24—officially released December 30, 2016\**

*Susann E. Gill*, supervisory assistant state's attorney, with whom were *James A. Killen*, senior assistant state's attorney, and, on the brief, *Kevin T. Kane*, chief state's attorney, *John C. Smriga*, state's attorney, *Leonard C. Boyle*, deputy chief state's attorney for operations, and *Jonathan C. Benedict*, former state's attorney, for the appellant-cross appellee (respondent).

*Hubert J. Santos*, with whom was *Jessica M. Walker*, for the appellee-cross appellant (petitioner).

*Opinion*

ZARELLA, J. In 2002, a jury found the petitioner, Michael Skakel, guilty of the 1975 murder of his neighbor, Martha Moxley (victim). After previous unsuccessful attempts to overturn his conviction, including two appeals to this court, the petitioner filed the habeas petition that is the subject of this appeal. In that petition, he principally claimed that his criminal trial counsel provided such inadequate representation that he was denied his constitutional right to have the effective assistance of counsel for his defense. The habeas court agreed with the petitioner on some of his claims and rendered judgment granting the petition. The respondent, the Commissioner of Correction, has appealed from the habeas court's judgment. Because we conclude that the petitioner's trial counsel rendered constitutionally adequate representation, we reverse the judgment of the habeas court and remand the case to that court with direction to render judgment denying the petition.[1]

## I

## FACTUAL BACKGROUND AND HABEAS COURT PROCEEDINGS

The facts relating to the petitioner's criminal conviction, as the jury reasonably could have found them, are set forth in detail in this court's decision on his direct appeal. See *State* v. *Skakel*, 276 Conn. 633, 640–53, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). Our discussion here highlights the facts most relevant to the present proceedings and is based on our recitation of the facts in the petitioner's direct appeal, as supplemented by the record from the petitioner's criminal trial and the habeas proceedings.

## A

### State's Case Against the Petitioner

On October 31, 1975, the body of the fifteen year old victim was found lying face down under a large pine tree on her family's Greenwich estate. Id., 642. She had numerous injuries to her head and neck, and her pants were unbuttoned and pulled down, along with her underwear, below her knees, although the medical examiner found no evidence of semen present in her pubic region. Id., 642–43. She had been attacked elsewhere on the Moxley property, near the driveway, and then dragged to the pine tree where she was later found. See id., 642. Police found broken pieces of a golf club nearby on the Moxley property. Id. An autopsy revealed that she had been attacked with the golf club, and authorities believe that it broke apart during the assault and that part of the club's shaft was used to stab the victim. Id., 644.

The victim had last been seen alive at about 9:30 p.m. the night before, October 30, 1975; see id., 641; which

was the night before Halloween, commonly known as "mischief night . . . ." (Internal quotation marks omitted.) Id., 640. The victim's mother had reported her missing in the early morning hours of October 31, after the victim failed to return home the previous night.[2] Id., 641–42. The medical examiner could not establish a precise time of death, but he believed that the victim more likely was murdered closer to when she was last seen alive at around 9:30 p.m. on October 30, than when her body was found at about noon the next day. Id., 643. He testified, however, that the findings from the autopsy were consistent with a broad time span, including from 9:30 p.m. on October 30, to 1 a.m. on October 31.

The petitioner, who was also fifteen at the time of the murder, lived with his father and six siblings in a home across the street from the victim.[3] See id., 640 and n.4. The petitioner and some of his siblings, including his older brother, Thomas Skakel, had been seen with the victim at various times on the night of October 30, 1975. Id., 640–41. That night, the petitioner had gone out to dinner with his siblings and the family's recently hired live-in tutor, Kenneth Littleton. Id. 640. They returned to the Skakel home at about 9 p.m. Id. The petitioner, the victim, other Skakel siblings and neighborhood friends spent some time in the Skakel driveway until about 9:30 p.m., when the petitioner's older brother used a family car to drive a cousin, James Terrien,[4] to his home, where they planned to watch a television show. Id., 641. The petitioner told the police a few weeks after the murder that he also had gone along to the Terrien house to watch the show. Id., 645. He further claimed that, upon returning to his home at about 10:30 or 11 p.m., he went inside his home and did not leave for the rest of the night. Id.

Despite their efforts in the years after the murder, including extensive investigations into whether Thomas Skakel or Littleton was involved, the police were unable to connect anyone to the murder and did not make any arrests. See id., 639.

Nearly twenty-five years after the murder, however, the state charged the petitioner after a grand jury investigation. Id. The state's case against the petitioner consisted primarily of circumstantial evidence and numerous, incriminating statements made by the petitioner himself. See generally id., 639–52.

The state presented testimony from witnesses who testified that the petitioner had made statements in the years after the murder implicating himself in the crime. A few years after the murder, the petitioner's family sent him to the Elan School in Maine (Elan), a residential treatment facility for troubled adolescents. See id., 646. One of his fellow residents at Elan, Dorothy Rogers, testified that the petitioner told her that his family had sent him to the school because they were afraid he had

committed the murder and wanted him away from the investigation in Greenwich. Id., 647–48. Another resident, Gregory Coleman, relayed that the petitioner once confided in him while they were at the school that he had killed a girl with a golf club in a wooded area, that the golf club broke apart during the attack, and that he had returned to the scene later and masturbated over the girl's body. Id., 648. Two other residents, Elizabeth Arnold and Alice Dunn, testified that, in another instance, the petitioner had been questioned during a group therapy session about his involvement in the murder, and he told the group that he or one of his brothers might have committed the crime. See id., 648–49. Arnold recalled that the petitioner also had told the group that, on the night of the murder, "[h]e was very drunk and had some sort of a black-out," that he had discovered that "his brother had fool[ed] around with his girlfriend," and that he was not in "his normal state" that night. (Internal quotation marks omitted.) Id., 649.

With respect to motive, the state argued at trial that the petitioner had become enraged after seeing the victim flirting with his older brother, Thomas Skakel, on the night she was last seen alive. See id., 651–52. Friends who knew the petitioner and the victim around the time of the murder confirmed that the petitioner had feelings for the victim and had grown resentful of Thomas Skakel, who had developed a flirtatious relationship with the victim. Id., 651. Friends of the victim also testified that, on the night the victim was last seen alive, they saw the victim engaging in flirtatious horseplay with Thomas Skakel near the Skakels' driveway, shortly after others had left for the Terrien home, and they did not see her again after that. Id., 641, 651–52. Although the petitioner had told the police that he went along to the Terrien home, the state presented testimony from a neighborhood friend who testified that the petitioner had stayed at the Skakel property. Id., 645 and n.9.

The state also presented evidence that the petitioner had lied to the police about his activities on the night of the murder. Several years after leaving Elan, he separately told two people that, on the night the victim was last seen alive, after returning home from watching television at the Terrien home, he had left his house, climbed a tree on the victim's property, and masturbated while watching the victim through her bedroom window, contradicting his statements to the police that he had remained inside all night and suggesting that he had seen the victim *after* returning from the Terrien home sometime after 11 p.m.[5] Id., 645, 649–50. The petitioner reiterated many of these details in a recorded statement that he gave to an author helping the petitioner as a ghost writer for an autobiography. See id., 650–51. In that recording, the petitioner described his actions on the night of the murder in detail, in contradiction to his earlier statements to others that he could not remember what had happened that night. See id.

He stated that, after returning from watching television at the Terrien home, he could not sleep and was sexually aroused, so he "snuck out" of his house and, after trying to spy on a woman who lived in the neighborhood, eventually went looking to "go get a kiss from [the victim]." (Internal quotation marks omitted.) Id., 650. He climbed a tree on the the victim's property and masturbated for about thirty seconds while trying to look into her bedroom window. Id. He climbed down the tree and walked toward his home. Id. While crossing the victim's yard near her driveway, he claimed that he threw rocks toward the victim's driveway area and yelled, "[w]ho's in there?" Id., 651. He also shouted, "come on motherfucker, I'll kick your ass." He also stated that, the following morning, when the victim's mother came to his home looking for her, he had "a feeling of panic" because he was afraid he had been seen in the tree the night before. (Internal quotation marks omitted.) Id.

## B

### The Petitioner's Defense

The petitioner retained Attorney Michael Sherman to represent him in his criminal proceedings. At the time of the trial, Sherman had practiced in the area of criminal law for more than thirty years, both as a defense attorney and as a prosecutor. To prepare his defense, Sherman enlisted the help of at least three associate attorneys and received advice from other experienced criminal defense attorneys.[6] He also retained three private investigation firms and consulted with expert witnesses to assist in gathering evidence in support of the petitioner's defense.

Sherman's strategy for defending the petitioner at trial was threefold: (1) establish an alibi for the time when the murder most likely occurred; (2) discredit witnesses claiming that the petitioner had made statements implicating himself in the murder; and (3) present evidence showing that another person, the live-in tutor, Littleton, might have committed the murder. See id., 652–53.

With respect to the alibi defense, Sherman presented evidence to show that the murder most likely occurred at about 10 p.m. on October 30, 1975, when, the petitioner claims, he was at the Terrien house watching a television show. As we explained in our decision on the petitioner's direct appeal, there was evidence presented that "residents in the neighborhood heard [dogs barking and voices] between 9:30 and 10 p.m. on October 30, 1975, near the Moxley property. [The victim's mother] testified that, around that time, she heard a commotion coming from the general direction of the area where the victim's body subsequently was discovered. She recalled hearing dogs barking and what sounded like excited young voices. [A neighbor] testified that her

dog began to bark incessantly shortly after 9:30 p.m. [One of the petitioner's brothers] also recalled hearing dogs barking at approximately 10 p.m. that night." Id., 643 n.7. In addition, Sherman "adduced testimony from . . . a forensic pathologist . . . who concluded that the time of the victim's death most likely was around 10 p.m. on October 30, 1975. [His] testimony was bolstered by the testimony of several people . . . [who stated] that they had heard dogs barking in the vicinity of the crime scene at approximately that time." Id., 652 n.14.

To establish the petitioner's whereabouts from approximately 9:30 to 10 p.m. on October 30, 1975, Sherman called a number of witnesses who testified that, during that time frame, the petitioner was with them at the Terrien home, which was nearly a twenty minute drive from the victim's home. See id., 652 and n.14. These witnesses included the petitioner's cousin, Terrien, and one of the petitioner's older brothers, Rushton Skakel, Jr., who had gone to the Terrien home. They testified at the criminal trial that the petitioner had left the Skakel home with them at about 9:30 p.m. on October 30, and had ridden with them in a vehicle to the Terrien home where they watched a television show. They further testified that the petitioner and others did not return to the Skakel home until approximately 11 p.m. that night.[7]

Sherman also sought to discredit the testimony from Elan residents who claimed that they had heard the petitioner incriminate himself. Sherman cross-examined the state's witnesses to impeach their credibility and cast doubt on their testimony, and also presented testimony from several other Elan residents who knew the petitioner while he was an Elan resident. These other residents testified to the brutal and abusive treatment of residents, including the petitioner. The witnesses explained that school staff frequently accused the petitioner of the murder and urged him to admit his involvement. When he refused to take responsibility, he was paddled, assaulted in a boxing ring, and forced to wear a sign that had written on it something to the effect of "please confront me on the murder of my friend, Martha Moxley . . . ." These witnesses also stated that the petitioner denied involvement in the victim's murder, and, when the abuse continued, he parried their accusations by stating that he either did not know or could not recall what happened; they never heard the petitioner confess to the crime.

Finally, Sherman sought to bolster the petitioner's defense by implicating another person in the crime. Sherman explained at the habeas trial that he did not want to use a "buffet table of alleged suspects," so he chose to focus on one person, Littleton. As we explained in our decision in the petitioner's direct appeal, "Littleton . . . had been hired as a part-time tutor by the

Skakel family, had taken up residence at the Skakel home on October 30, 1975, the day that the victim was last seen alive, and had slept there with the Skakel children that night. Littleton testified [at the petitioner's criminal trial] that, after returning home from dinner at 9 p.m., he remained at the house all night, stepping outside briefly at approximately 9:30 p.m. only to investigate a disturbance. In addition, testimony adduced by [Sherman] revealed that Littleton, who began to manifest serious psychiatric and behavioral problems in the years following the murder, may have made a statement, several years after the killing, in which he implicated himself in the crime. Littleton emphatically denied that he had anything to do with the victim's death, however." (Footnote omitted.) *State* v. *Skakel*, supra, 276 Conn. 652–53.

At the conclusion of the petitioner's criminal trial, the jury found the petitioner guilty of murder. Id., 653. The trial court rendered judgment in accordance with the jury's verdict and sentenced the petitioner to a period of incarceration of twenty years to life. Id. The petitioner appealed from the judgment of conviction to this court, raising six separate grounds for reversing his conviction; id., 639–40; and this court affirmed the judgment. Id., 770. The petitioner later filed a petition for a new trial on the basis of newly discovered evidence and other claims, but the trial court denied the petition, and this court upheld the trial court's denial of the new trial petition. See *Skakel* v. *State*, 295 Conn. 447, 452, 991 A.2d 414 (2010).

C

Habeas Petition

Nearly eight years after his conviction, and after his prior unsuccessful challenges to his conviction, the petitioner filed the habeas petition at issue in the present case. He claimed, among other things, that Sherman rendered constitutionally ineffective assistance in numerous respects, depriving him of his right to the effective assistance of counsel. He also claimed that Sherman had a conflict of interest in representing him.

After a hearing, the habeas court granted the petition. The court agreed with some of the petitioner's ineffective assistance claims, concluding that Sherman was ineffective on three grounds: (1) by failing to fully investigate and implicate the petitioner's brother, Thomas Skakel, in the murder; (2) by failing to investigate and present an additional alibi witness, Denis Ossorio, who the petitioner claims saw him at the Terrien house on the night of October 30, 1975; and (3) by failing to call three additional witnesses to impeach the credibility of Gary Coleman, who claimed that the petitioner implicated himself in the murder while he was a resident at Elan. The habeas court also concluded that Sherman had acted deficiently in certain other respects but that

none of those deficiencies, when considered separately, prejudiced the petitioner. Finally, the habeas court rejected the petitioner's conflict of interest claim.

This appeal followed. Collectively, the parties have raised eleven separate issues for our resolution, each concerning whether Sherman provided effective assistance. On appeal, the respondent raises three issues, arguing that the habeas court incorrectly concluded that Sherman was ineffective by (1) failing to implicate Thomas Skakel, (2) failing to call an additional alibi witness, and (3) failing to call witnesses to impeach Coleman's testimony. For his part, the petitioner has raised seven alternative grounds for affirming the habeas court's judgment, each attacking a different aspect of Sherman's representation. Finally, the petitioner filed a cross appeal, claiming that the habeas court improperly rejected his conflict of interest claim, which we treat as an additional alternative ground for affirming the habeas court's judgment.

We first address the respondent's three claims. Because we conclude that the habeas court's conclusions as to each of those claims must be rejected, we also address each of the petitioner's alternative grounds for affirmance and his separate conflict of interest claim. Additional historical and procedural facts relevant to our resolution of each claim will be set forth as necessary.

## II

## THE RESPONDENT'S CLAIMS ON APPEAL

### A

### Standard of Review for Claims of Ineffective Assistance of Counsel

The sixth and fourteenth amendments to the United States constitution guarantee criminal defendants the right to have counsel for their defense in state prosecutions. This guarantee is essential to ensuring a fair trial. See, e.g., *Powell* v. *Alabama*, 287 U.S. 45, 70, 53 S. Ct. 55, 77 L. Ed. 158 (1932). As the United States Supreme Court has explained, "[t]he right to counsel plays a crucial role in the adversarial system embodied in the [s]ixth [a]mendment, [because] access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled." (Internal quotation marks omitted.) *Strickland* v. *Washington*, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Implicit in this guarantee is the right to have *effective* assistance of counsel.[8] Id., 686.

In *Strickland*, the United States Supreme Court set forth a two part standard for deciding whether a defendant can prevail on a claim that defense counsel rendered constitutionally ineffective representation: "The benchmark for judging any claim of ineffectiveness

must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires [a] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the [s]ixth [a]mendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires [a] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id., 687. Although the standard is composed of two components, a court need not address both if the defendant makes an insufficient showing as to either one. Id., 697. Moreover, "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney. . . . Representation is constitutionally ineffective only if it so undermined the proper functioning of the adversarial process that the defendant was denied a fair trial." (Citations omitted; internal quotation marks omitted.) *Harrington* v. *Richter*, 562 U.S. 86, 110, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011), quoting *Strickland* v. *Washington*, supra, 466 U.S. 686.

### 1

### Performance Component

As to *Strickland*'s first component, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland* v. *Washington*, supra, 466 U.S. 688. "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Citation omitted.) Id., 689.

*Strickland* directs courts assessing counsel's performance to be deferential to counsel's strategic decisions and to apply a strong presumption that such decisions are reasonable. "Because of the difficulties inherent in making [this] evaluation, a court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (Citation omitted; internal quotation marks omitted.) Id. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . . At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and [to have] made all significant decisions in the exercise of reasonable professional judgment." Id., 690.

This deference applies equally to claims alleging that counsel unreasonably chose not to pursue possible defenses or to present certain evidence. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, [with application of] a heavy measure of deference to counsel's judgments." Id., 690–91.

2

Prejudice Component

With respect to the second component, even if counsel performs deficiently, a defendant is entitled to relief from his conviction only if he can prove that his counsel's unreasonable errors or omissions prejudiced his defense. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. . . . The purpose of the [s]ixth [a]mendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the [c]onstitution." (Citation omitted.) Id., 691–92.

In assessing a claim of prejudice, courts must consider the impact of counsel's errors in light of all the evidence presented at the original trial. "[A] court hearing an ineffectiveness claim must consider the totality

of the evidence before the judge or jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." Id., 695–96.

The defendant has the burden to "affirmatively prove prejudice." Id., 693. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test . . . and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." (Citation omitted.) Id. "On the other hand . . . a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 694. Put another way, "the question is whether there is a reasonable probability that, absent the errors, the [fact finder] would have had a reasonable doubt respecting guilt." Id., 695. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' . . . The likelihood of a different result must be substantial, not just conceivable." (Citation omitted.) *Harrington* v. *Richter*, supra, 562 U.S. 111–12, quoting *Strickland* v. *Washington*, supra, 466 U.S. 693, 697.

3

Standard of Review in Habeas Appeals

In reviewing the habeas court's decision as to an ineffective assistance claim, we defer to the habeas court's findings of historical fact concerning the representation but exercise plenary review over its conclusions about whether, based on those findings, counsel's performance was deficient and prejudicial. See, e.g., *Gonzalez* v. *Commissioner of Correction*, 308 Conn. 463, 469–70, 68 A.3d 624 (2013) ("[a]lthough the underlying historical facts found by the habeas court may not be disturbed unless they were clearly erroneous, whether those facts constituted a violation of the petitioner's rights under the sixth amendment is a mixed determination of law and fact that requires . . . plenary review

by this court unfettered by the clearly erroneous standard" [internal quotation marks omitted]).

## B

### Failure To Implicate Thomas Skakel in the Murder

The respondent first claims that the habeas court incorrectly concluded that Sherman's performance was ineffective insofar as Sherman chose to pursue a third-party culpability defense focused on Littleton rather than on Thomas Skakel. We agree with the respondent and conclude that Sherman's decision not to pursue a defense implicating Thomas Skakel was a reasonable strategic decision made after adequate investigation. The petitioner did not establish that Sherman had access to admissible evidence to support a defense implicating Thomas Skakel. Moreover, even if Sherman had such evidence, he reasonably chose not to pursue this defense because doing so might have harmed the petitioner's defense by supporting aspects of the state's case.

### 1

### Additional Background

We begin by reviewing the information then available to Sherman concerning his decision to raise a defense implicating Littleton and not Thomas Skakel. Sherman chose to focus the third-party defense on only one suspect. He explained during the habeas trial that he does not advocate putting out a "buffet table of alleged suspects," but, rather, prefers focusing a third-party culpability defense on only one suspect. Although he considered implicating Thomas Skakel, he ultimately chose Littleton because he did not think there was enough evidence to connect Thomas Skakel to the murder and believed that there was a greater chance of creating reasonable doubt by implicating Littleton.

Sherman detailed the evidence he intended to present about Littleton's possible involvement in a pretrial motion seeking the court's permission to raise a defense implicating Littleton. In the motion, Sherman explained that he intended to present testimony showing that physical evidence connected Littleton to the crime scene and that Littleton may have confessed to the crime. According to Henry Lee, a forensic scientist and former state criminalist, two hairs found at the crime scene were microscopically similar to head hairs from Littleton. Sherman also intended to present evidence that Littleton may have admitted his involvement in the crime to his former wife, Mary Baker. With Baker's cooperation, investigators had recorded conversations between Littleton and Baker. In those conversations, Baker and Littleton discussed prior occasions when Littleton may have told Baker that he had murdered the victim and that, during the attack, the victim "wouldn't die" after being hit with the golf club, so he "had to stab her through the neck."

In the pretrial motion, Sherman explained that he also planned to show that Littleton had lied to the police in his initial statement about his activities on the night the victim was last seen alive, October 30, 1975, and later had changed his account about his activities that night on several occasions. Littleton initially told police that he had returned to the Skakel house at about 9 p.m. after having dinner with the Skakel children at the Belle Haven Club and that he had not left the house again that night. He also reported that did not see or hear anything suspicious. About two months later, however, he changed his account and acknowledged that he had not stayed inside all night but had left the house at about 9:15 or 9:30 p.m., and walked around the Skakel property. The pretrial motion noted that this was about the time police believed the victim was leaving the Skakel property and returning to her home across the street.

Finally, Sherman planned to present evidence showing that Littleton's behavior changed " 'markedly' " after the murder. According to Sherman, investigators extensively documented records and other evidence cataloguing how Littleton was convicted of committing numerous crimes and had engaged in other "uncharged misconduct" in the months and years after the murder. Sherman also intended to present evidence of a telephone conversation years after the murder between Littleton and the victim's father, during which Littleton referred to the murder as their "mutual tragedy . . . ." (Internal quotation marks omitted.)

The trial court allowed Sherman to present a defense implicating Littleton, and Sherman presented evidence at trial concerning Littleton's potential involvement in the murder. See, e.g., *State* v. *West*, 274 Conn. 605, 626, 877 A.2d 787 (trial court has discretion to decide whether to admit third-party culpability evidence at trial), cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005). Because the jury ultimately found the petitioner guilty of the victim's murder, it necessarily must have rejected this defense.[9]

In his claim for habeas relief, the petitioner argued that Sherman was ineffective for not implicating Thomas Skakel in the murder, either instead of, or in addition to, implicating Littleton. Both Thomas Skakel and Littleton had previously been suspects in the murder and were extensively investigated by the police. The petitioner claimed that the evidence against Thomas Skakel was strong enough that, if Sherman had presented a defense implicating Thomas Skakel, a jury likely would have found the petitioner not guilty.

The habeas court agreed with the petitioner and concluded that Sherman's strategic decision not to pursue a defense implicating Thomas Skakel in the murder had deprived the petitioner of effective assistance of

counsel. The habeas court acknowledged that Sherman's choice to present a third-party culpability defense directed at only one suspect might be a reasonable strategy but nevertheless determined that Sherman's decision to pursue Littleton instead of Thomas Skakel was unreasonable. According to the habeas court, Sherman had strong evidence in his possession that could have supported an assertion that Thomas Skakel had murdered the victim, and Sherman's failure to do so was both deficient and prejudicial.

The habeas court found that Sherman had evidence available indicating that Thomas Skakel had lied to the police about his activities on the night the victim was last seen alive. The police first interviewed Thomas Skakel in the days after the murder. He told them that, after returning from dinner at the Belle Haven Club on the night of October 30, 1975, he sat in a vehicle owned by the Skakels and parked in the Skakels' driveway with the petitioner and some friends, including the victim. At about 9:15 p.m., Thomas Skakel's older brother, Rushton Skakel, Jr., said he needed the car to take Terrien back to Terrien's house, and that Thomas Skakel and others, including the victim, exited the vehicle. Thomas Skakel told the police that, after the vehicle left, he spoke to the victim for a few moments and then went up to his room to complete a homework assignment until about 10:15 p.m., when he joined Littleton to watch part of a television show. The habeas court noted, however, that Sherman had evidence available to him demonstrating that Thomas Skakel was not assigned any homework of the kind that he had described. In addition, several years after the murder, in the 1990s, Thomas Skakel allegedly told a different story to an investigative firm known as Sutton Associates, which had been retained by the Skakel family's attorneys to further investigate the murder. According to a report supposedly authored by Sutton Associates (Sutton Report), Thomas Skakel stated that, after getting out of the vehicle that night, he and the victim spent some time talking and then both went to an area elsewhere on the Skakel property where they had a consensual sexual encounter. Thomas Skakel allegedly told Sutton Associates that he had fondled the victim's breasts and vagina, and that he did not remove her bra but had unbuttoned her pants and lowered them slightly. He further explained that they fondled each other's genitals until each reached orgasm and that, afterward, the victim buttoned her pants and walked across the Skakel property toward her house. Thomas Skakel apparently reported that the encounter began at around 9:30 p.m. and ended at about 9:50 p.m. He claimed that, after the victim left, he went back inside his home and joined Littleton to watch television. The habeas court found the timing of the supposed encounter significant because the petitioner had argued at his criminal trial that the murder likely occurred sometime between 9:30

and 10 p.m., on the basis of evidence that some type of commotion had occurred during that time.

The habeas court also observed that Sherman could have argued that Thomas Skakel's story of his sexual encounter with the victim was consistent with some of the evidence found at the crime scene. According to testimony presented at the petitioner's criminal trial, the victim was found with her pants unbuttoned and with her pants and underwear pulled down below her knees. Testimony at the criminal trial indicated that they might have been pulled down before the assault began because blood spatter was found on the inside of the pants. The victim also had no defensive wounds or foreign DNA under her fingernails. According to the habeas court, Sherman could have used these facts to argue that the unbuttoning of her pants was consensual, giving credibility to Thomas Skakel's supposed claim of a consensual sexual encounter with the victim.

On the basis of this evidence, the habeas court explained that Sherman could have argued that "what may have started as a consensual encounter between the victim and [Thomas] Skakel may have turned terribly bad." Although there was no direct evidence to establish that Thomas Skakel had attacked the victim during their meeting, the habeas court nevertheless noted that Sherman might have been able to rely on circumstantial evidence to imply that Thomas Skakel could have become violent. The habeas court cited to evidence that Thomas Skakel had romantic feelings for the victim and that she may have rebuffed his overtures. The court also noted that Sherman had a copy of an early suspect profile report from a Houston, Texas medical examiner, prepared at the request of police investigators. That report contained an opinion that "[the] attacker was someone known to her . . . who has a probable unstable personality, homosexually inclined, [and] either panicked following what may have started out as a prank, or became so angry upon being rejected that he engaged in an 'overkill.' " Finally, the habeas court found that Sherman had "substantial background evidence available to him of [Thomas] Skakel's mental and emotional instability, and his penchant for violent outbursts."

The habeas court acknowledged, however, that much of the evidence that it had identified to implicate Thomas Skakel might not have been admissible at the petitioner's criminal trial. Most of the habeas court's conclusions concerning the evidence against Thomas Skakel were based on the Sutton Report and information contained in early police reports, both of which the habeas court acknowledged would, in all likelihood, not have been admissible. Nevertheless, the habeas court explained that they provided Sherman with "an investigative gateway" to "seek and obtain admissible evidence on the [subject or subjects] covered." Notably,

however, the habeas court did not explain or make any findings about how Sherman could have obtained admissible evidence or precisely what that evidence would have been.

On the basis of its review of the evidence available to Sherman, the habeas court determined that he had rendered ineffective assistance of counsel to the petitioner. With respect to the performance component of *Strickland*, the court concluded that Sherman's choice to pursue Littleton instead of Thomas Skakel was unreasonable and thus deficient: "[G]iven the strength of evidence regarding [Thomas] Skakel's direct involvement with the victim at the likely time of her death, consciousness of guilt evidence concerning [Thomas] Skakel's activities on the evening in question, the circumstantial evidence of his sexual interest in the victim, and [Thomas] Skakel's history of emotional instability, [Sherman's] failure to pursue a third-party claim against [Thomas] Skakel cannot be justified on the basis of deference to strategic decision making. If . . . Sherman was, in fact, committed to the notion that only one third-party culpability defense should be asserted, a proposition [the habeas] court believes may well be within [Sherman's] informed discretion, he unreasonably chose a third party against whom there was scant evidence and ignored a third party against whom there was a plethora of evidence."[10] As to the prejudice component of *Strickland*, the habeas court further concluded that this deficiency prejudiced the petitioner's defense because, if Sherman had presented a defense implicating Thomas Skakel, the jury likely would have had a reasonable doubt about the petitioner's guilt.

### 2

### Analysis

We take as the starting point of our analysis the "strong presumption" that counsel's strategic decisions—including whether to pursue a third-party culpability defense—are an "exercise of reasonable professional judgment." *Strickland* v. *Washington*, supra, 466 U.S. 689, 690. Because of this presumption, decisions made by counsel after adequate investigation are "virtually unchallengeable . . . ." Id., 690. The petitioner has the burden to overcome this strong presumption of competence by demonstrating that there was *no* objectively reasonable justification for counsel's decision: "As a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 79, 967 A.2d 41 (2009). Counsel's decision need not have been the best decision, or even a good one; it need only fall within the wide range of reasonable decisions that a defense attorney in counsel's position might make. See, e.g., *Harrington* v. *Rich-*

*ter*, supra, 562 U.S. 110; *Strickland* v. *Washington*, supra, 689. Thus, as long as there is some reasonable basis for counsel's decision, we may not second-guess counsel's choice after that defense has proven a failure, and we must defer to counsel's exercise of professional judgment. *Strickland* v. *Washington*, supra, 689–91.

Applying these principles to the present case, we conclude that Sherman's decision to implicate Littleton instead of Thomas Skakel was reasonable and, therefore, not constitutionally deficient for at least two reasons.

i

Lack of Admissible Evidence
Implicating Thomas Skakel

First, we agree with the respondent that Sherman did not have admissible evidence available to him to present a third-party defense implicating Thomas Skakel. To raise a third-party culpability defense, defense counsel must be able to present evidence at trial that directly links the third party suspect to the crime alleged. E.g., *State* v. *Hernandez*, 224 Conn. 196, 202, 618 A.2d 494 (1992) ("The defendant must . . . present evidence that directly connects a third party to the crime with which the defendant has been charged . . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." [Citations omitted; internal quotation marks omitted.]). To prove that Sherman was deficient for failing to implicate Thomas Skakel, the petitioner thus needed to show that Sherman had admissible evidence available to him to support that defense at trial. See, e.g., *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 515, 964 A.2d 1186 (defense counsel cannot be deemed deficient for failing to present third-party defense when there is insufficient evidence to support it), cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009); see also *Floyd* v. *Commissioner of Correction*, 99 Conn. App. 526, 532, 914 A.2d 1049 (rejecting ineffective assistance claim when "the petitioner failed to prove that the witnesses were available to testify at trial, what they would have testified about or that their testimony would have had a favorable impact on the outcome of the trial"), cert. denied, 282 Conn. 905, 920 A.2d 308 (2007). The petitioner failed to meet this burden.

To have any hope of directly linking Thomas Skakel to the murder, Sherman first needed admissible evidence that confirmed that Thomas Skakel had a sexual encounter with the victim on the night of October 30, 1975. Sherman also needed evidence to establish details about how the encounter unfolded, including the time it occurred, and that Thomas Skakel had unbuttoned

and pulled the victim's pants down during their meeting. Evidence of the time the encounter took place—between 9:30 and 9:50 p.m.—would be needed to place Thomas Skakel with the victim at or around the time the petitioner had claimed she was murdered—between 9:30 and 10 p.m.[11] Evidence showing that Thomas Skakel unbuttoned and pulled the victim's pants down would be necessary to establish the tenuous connection the habeas court noted between Thomas Skakel's alleged description of their encounter and the crime scene evidence. Without these details, there could be no possibility of implicating Thomas Skakel because Sherman would have been able to prove only that Thomas Skakel was the last person to have seen the victim alive—a fact made known at trial and hardly enough to directly connect him to the victim's murder.[12] See *Mukhtaar* v. *Commissioner of Correction*, 158 Conn. App. 431, 448–50, 119 A.3d 607 (2015) (counsel was not ineffective for declining to present third-party defense when evidence showed only that third party was present at crime scene).

The record before the habeas court fails to demonstrate that Sherman had access to admissible evidence to prove these details at the petitioner's criminal trial. The details about Thomas Skakel's encounter with the victim, as the habeas court relayed them, come from the Sutton Report, which describes an interview during which Thomas Skakel allegedly discussed the encounter. The habeas court acknowledged, however, that the Sutton Report likely would not have been admissible at the petitioner's trial; indeed, the report itself would have constituted double hearsay and possibly have been privileged. Sherman also could not have introduced the details of the encounter through Thomas Skakel because his counsel told Sherman before trial that, if called as a witness, Thomas Skakel would assert his privilege against self-incrimination and decline to testify. Thomas Skakel was not called as a witness at either the criminal trial or the habeas trial, and, thus, the record is devoid of proof that Thomas Skakel would have testified at the criminal trial and, if he did, what the substance of his testimony would have been.

The habeas court found that counsel could have presented evidence about the encounter through one of the petitioner's attorneys, but this finding is not supported by the record. Evidence presented at the habeas trial shows that, just one week before the beginning of the petitioner's criminal trial, Sherman and Jason Throne, another attorney representing the petitioner, met with Thomas Skakel and his attorney. The habeas court found that, at this meeting, Thomas Skakel recounted the specifics of his sexual encounter with the victim to Sherman and Throne. Based on this determination, the habeas court concluded that Throne could have withdrawn as the petitioner's counsel—just days before trial—and could have testified as a witness about

what Thomas Skakel had said at that meeting.

This finding is unsupported by the evidence in the record, however, because Throne testified at the habeas trial that he had no recollection of any discussion by Thomas Skakel during their meeting about his sexual contact with the victim.[13] "[A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . ." (Internal quotation marks omitted.) *Orcutt* v. *Commissioner of Correction*, 284 Conn. 724, 742, 937 A.2d 656 (2007). In the present case, Throne recalled that Thomas Skakel said only that he had seen the victim later on the evening of October 30, 1975, but Thorne could not recall whether Thomas Skakel made any mention of the time that meeting occurred. Nor did Throne recall Thomas Skakel's discussing any sexual contact between him and the victim.[14] The habeas record thus contains no other evidence on which the habeas court could properly base any findings about what Throne's testimony would have been if he had been called as a witness at the petitioner's criminal trial in 2002.[15] Any finding concerning the details that Throne could have relayed to the jury about Thomas Skakel's alleged encounter with the victim would therefore be entirely speculative and inconsistent with the evidence actually presented at the habeas trial. The petitioner, as the party with the burden of proof at the habeas trial, was required to prove that Sherman would have had access to admissible evidence to support this theory. When the petitioner's claim rests on the argument that counsel should have called a certain witness to establish a defense, the petitioner must present to the habeas court what the substance of the witness' testimony would have been. See, e.g., *Thomas* v. *Commissioner of Correction*, 141 Conn. App. 465, 472, 62 A.3d 534, cert. denied, 308 Conn. 939, 66 A.3d 881 (2013). Consequently, if the petitioner intended to rest the strength of his claim on the notion that Throne could have provided significant details to support a third-party culpability defense implicating Thomas Skakel, it fell on the petitioner to proffer evidence to show what Throne's testimony at the criminal trial would have been. Because Throne's testimony at the habeas trial failed to establish what he would have testified to if he had been called to testify at the petitioner's criminal trial, the petitioner failed to meet this burden.

Thus, there is no reasonable basis to conclude that Sherman had admissible evidence available to him concerning the details of Thomas Skakel's alleged sexual contact with the victim.[16] Without this significant threshold evidence, Sherman would not have been permitted to implicate Thomas Skakel at the petitioner's criminal trial and, therefore, could not have been found to be ineffective for failing to do so. See, e.g., *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 515 ("[i]t is not ineffective assistance of counsel . . . to decline to pursue a [third-party] culpability defense

when there is insufficient evidence to support that defense").

ii

### Sherman Reasonably Could Have Chosen Not To Implicate Thomas Skakel

Second, even if we were to assume, for the sake of argument, that Sherman had access to admissible evidence detailing Thomas Skakel's alleged sexual encounter with the victim, we nevertheless would conclude that Sherman reasonably could have chosen to forgo a defense implicating Thomas Skakel because of a lack of stronger evidence to tie him to the crime, especially in light of the possible risks associated with presenting the evidence needed to support such a defense.

The evidence available to Sherman, as reviewed by the habeas court, might place Thomas Skakel with the victim around the time the petitioner claims she was murdered, but it does not establish that their meeting turned violent. Witnesses who saw Thomas Skakel with the victim shortly before the alleged sexual encounter took place characterized Thomas Skakel's interactions with the victim as "playful" and "flirtatious . . . ." Perhaps Sherman might have tried to cast doubt on Thomas Skakel's claim of an entirely consensual encounter by referring to evidence that the victim had previously rebuffed his flirtatious advances, or could have argued that Thomas Skakel had something to hide given that he had concealed from the police his story of a sexual encounter with the victim. But to connect Thomas Skakel to the murder, one would have to speculate that, despite evidence that the victim was openly and playfully flirting with him, and might even have allowed him to unbutton her pants, he nevertheless became so enraged that he retrieved a golf club and beat her to death.[17] Additionally, unlike with Littleton and the petitioner, there is no evidence that Thomas Skakel has ever claimed involvement in the victim's murder. Moreover, Sherman had no forensic evidence linking Thomas Skakel to the murder, unlike in the case of Littleton, whose hair was determined to be similar to hairs found around the victim's body. And unlike with the petitioner—who admitted to wandering around the the victim's property and being in the area of the crime scene on October 30, 1975—there is no evidence to place Thomas Skakel at the scene where the victim was attacked or where her body was found.

Instead of choosing to ask the jury to make the leap over this evidentiary lacuna as a means of finding reasonable doubt, defense counsel in Sherman's position reasonably could have concluded that it was better to pursue a suspect who had at least arguably implicated himself in the crime. Counsel might reasonably have feared that blaming Thomas Skakel, the petitioner's

own brother, without any stronger evidence linking him directly to the murder could cause the jury to doubt the credibility of the defense case generally, or could appear desperate.

This concern appears all the more reasonable in light of the significant risks associated with implicating Thomas Skakel. See, e.g., *Crocker* v. *Commissioner of Correction*, 126 Conn. App. 110, 131–32, 10 A.3d 1079 (declining to second-guess counsel's decision not to present certain evidence when that evidence might have also inculpated petitioner), cert. denied, 300 Conn. 919, 14 A.3d 333 (2011); see also *Harrington* v. *Richter*, supra, 562 U.S. 108–109 (counsel's representation was not unreasonable when counsel elected not to use evidence that might have harmed petitioner's case); *Greiner* v. *Wells*, 417 F.3d 305, 324 (2d Cir. 2005) ("[w]e cannot fault [defense counsel] for refusing to introduce evidence of [third-party culpability] in light of its 'significant potential downside' . . . [namely] that it would have opened the door to a prosecution line of inquiry harmful to the defense" [citation omitted]), cert. denied sub nom. *Wells* v. *Ercole*, 546 U.S. 1184, 126 S. Ct. 1363, 164 L. Ed. 2d 72 (2006). Evidence confirming a sexual encounter between Thomas Skakel and the victim on the night of October 30, 1975, would have also strengthened the state's case against the petitioner by providing the state with additional evidence of the petitioner's motive to commit the crime, such as jealously, and by corroborating details in some of the petitioner's own self-incriminating statements. The state's evidence concerning the petitioner's confessions, together with the petitioner's statements about his activities that night, were the state's primary evidence of guilt. Sherman's principal defense against this evidence was to discredit it. Introducing evidence that might corroborate some of the petitioner's incriminating statements thus presented the risk of strengthening the state's case.

The state's theory of motive centered on evidence that the petitioner had been infatuated with the victim and implied that he had become upset with her relationship with Thomas Skakel, leading him to attack her in a jealous rage. See *State* v. *Skakel*, supra, 276 Conn. 651–52. The state possessed evidence, made known to the defense through pretrial discovery, establishing that the petitioner had made statements claiming that, on the night the victim was last seen alive, he had discovered that Thomas Skakel had a sexual encounter with the victim, and that the petitioner had blacked out and could not remember what happened that night. For example, a June 23, 2000 police report indicated that a witness who knew the petitioner from Elan told the police that, during a group session, the subject of the victim's murder came up and the petitioner "announced that his brother [Thomas Skakel] had fucked his girlfriend" and that he "had been running around outside, that he was drunk, had blacked out and that the next

morning he woke up and [the victim] was dead." The state had additional evidence demonstrating that the petitioner had made similar statements to another person on a separate occasion, specifically, that he had killed a girl that he liked with a golf club after discovering that his brother "Tommy" had a sexual encounter with her.[18]

Presenting evidence that Thomas Skakel had admitted to engaging in a consensual sexual encounter with the victim would have significantly bolstered the state's evidence of motive and added credibility to the state's case by corroborating evidence of the petitioner's own incriminating statements. Without admissible evidence of Thomas Skakel's supposed statements, the state did not have evidence to confirm a sexual encounter between Thomas Skakel and the victim on the night of October 30, 1975. The state thus had to rely on the petitioner's self-incriminatory statements, together with evidence from eyewitnesses who had seen Thomas Skakel and the victim engaging in flirtatious horseplay, to establish its theory of motive. Evidence confirming a sexual encounter would undoubtedly have been more compelling and corroborative than evidence of flirting.[19]

In concluding that Sherman provided inadequate representation for not implicating Thomas Skakel, the habeas court did not examine the possible risks of doing so; it focused instead on the potential arguments counsel might have made to implicate Thomas Skakel and the potential benefits of such a defense. But tactical decisions of this kind require consideration of both the potential benefits and *the potential risks* of pursuing a particular strategy. *Strickland* requires "that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland* v. *Washington*, supra, 466 U.S. 689. Courts reviewing a defense attorney's decision, years after it was made and after it proved unsuccessful, must take a highly deferential approach and examine all of the circumstances surrounding counsel's choice to ensure that there is *no* reasonable basis for counsel's choice before second-guessing it. See id.

Applying this deferential approach, we conclude, contrary to the habeas court, that Sherman's performance was not deficient and thus could not have deprived the petitioner of a constitutionally adequate defense. Given the perils of implicating Thomas Skakel and the lack of admissible evidence supporting this defense, a defense attorney in Sherman's shoes reasonably could have concluded that implicating Thomas Skakel was simply not worth the risks, at least not without stronger evidence to directly link him to the murder. There were risks and benefits to implicating either Thomas Skakel or Littleton. Certainly, the case against Littleton also had

its own drawbacks. Although the strength of the evidence concerning Littleton's supposed admissions was uncertain, at best, the trial court nevertheless concluded that there was enough evidence to connect Littleton to the murder and allowed Sherman to present a third-party culpability defense implicating Littleton. And, in deciding to implicate Littleton, Sherman knew that he would be able to cross-examine Littleton before the jury, permitting the jury to assess Littleton's credibility in person. Implicating Thomas Skakel, by contrast, would give the jury no similar opportunity to observe Thomas Skakel's demeanor in court, under examination. Rather, under the petitioner's theory, the key facts supporting a defense implicating Thomas Skakel would be presented through hearsay testimony from a former attorney who represented the petitioner. In hindsight, we know that Sherman's choice to implicate Littleton was not a winning strategy. But, viewing the evidence from the point of view of a reasonable defense attorney at the time Sherman formulated his strategy, it was not unreasonable for counsel in Sherman's position to have concluded that highlighting Littleton's own doubts about his involvement was a more prudent option for sowing reasonable doubt. We thus need not address the issue of prejudice under *Strickland*'s second prong and conclude that the petitioner failed to meet his burden of proving ineffectiveness on this basis.

C

### Failure To Identify and Call
### Additional Alibi Witness

The respondent next claims that the habeas court incorrectly concluded that Sherman's representation was ineffective insofar as he failed to present testimony from an independent alibi witness, Dennis Ossorio. We agree with the respondent that Sherman's performance in this regard was not ineffective.

1

### Additional Background

The petitioner's claim of an alibi was strongly contested by the state at his criminal trial. At trial, the petitioner argued that the murder likely occurred between 9:30 and 10 p.m. on October 30, 1975, at a time when he claimed to be at Terrien's home. The habeas court described the trial evidence concerning the petitioner's alibi as follows. On the evening of October 30, "the petitioner, with his siblings Rushton [Skakel], Jr., Thomas [Skakel], John [Skakel], Julie [Skakel], David [Skakel] and Stephen [Skakel], their cousin . . . Terrien . . . [Julie Skakel's] friend Andrea Shakespeare, and the family tutor . . . Littleton, left the Skakel residence in [the Greenwich neighborhood of] Belle Haven for dinner at the Belle Haven Club at approximately 6:15 p.m. and returned to the Skakel home shortly before 9 p.m. . . . [Meanwhile, before] 9 p.m., the victim had

been out with her friend, Helen Ix, in the neighborhood enjoying the activities of 'mischief night.' Shortly after the group returned from the Belle Haven Club, the victim and Ix came to the Skakel residence, and, soon thereafter, the petitioner, a friend, Geoffrey Byrnes, the victim, and Ix entered [a car] to talk and listen to music. They were soon joined in the car by [Thomas] Skakel. Soon thereafter, at approximately 9:15 p.m., Rushton [Skakel], Jr., John Skakel . . . and Terrien came to the car and indicated they needed to use it to take Terrien to his home, approximately twenty minutes away. It [was] undisputed that, when Terrien, Rushton [Skakel], Jr., and John Skakel entered the [car], [Thomas] Skakel, Ix, Byrnes and the victim alighted from it, and that Ix and Byrnes shortly [thereafter] left for their respective homes, leaving [Thomas] Skakel and the victim standing together in the Skakel driveway. Whether the petitioner remained in the [car] en route to the Terrien home or got out of the car at the Skakel residence was significantly contested at trial because this issue related directly to the petitioner's alibi defense. [The petitioner] claimed, in sum, that he could not have committed the crime because the victim was murdered between 9:30 and 10 p.m. while he was still at . . . Terrien's home. While Terrien, Rushton [Skakel], Jr., and John [Skakel] indicated that the petitioner went with them to the Terrien home, Ix testified that she could not remember. Her testimony on this point was significantly contested. On direct [examination], she indicated her uncertainty. On [cross-examination] by . . . Sherman, she stated that she thought the petitioner was in the car as it left but she was not positive. After Ix testified, the state presented testimony from Shakespeare that the petitioner was at the Skakel home after the [car] departed. And, in rebuttal, the state presented testimony from Julie Skakel relevant to whether . . . the petitioner had left in the [car]. When Julie Skakel testified at trial to an uncertain memory of the events of the evening, the state was able to use . . . pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), the fact that she had testified at earlier hearings that, at approximately 9:20 p.m., she saw a figure darting by just outside the house to whom she called out: 'Michael, come back here.' Even though Julie Skakel testified that she did not know who the darting figure was, the jury was given the clear indication that, at least at that moment on October 30, 1975, she must have thought it was the petitioner. The state also adduced evidence that, at the same point in time, Julie [Skakel] was unable to state whether any cars remained in the driveway. The import of this evidence was the suggestion that, since Julie Skakel thought she saw the petitioner dart past the house at a point in time after the [car] had left the area, he did not, in fact, go to the Terrien residence. From the state's perspective, [Julie Skakel's] testimony could be harmonized with [Shakespeare's], who, as noted, testified to

her belief that the petitioner had not gone to the Terrien home on the evening in question.

"The contest regarding whether the petitioner had left the area in the [car] continued with the testimony of Terrien, Rushton [Skakel], Jr., and Georgeann Dowdle, Terrien's sister. While Terrien and Rushton [Skakel], Jr., testified that the petitioner was present in the Terrien home, Dowdle could only say that she heard the Skakel cousins' voices because she was in a different room and only within hearing range. She did say, however, that she had earlier told the police that the petitioner was there that evening. . . . Dowdle [also] testified before the grand jury in 1998 that she had been in the company of her 'beau' at the Terrien residence when the Skakel cousins were there."

"Even though . . . Sherman was privy to . . . Dowdle's testimony before trial from his access to the transcript of her grand jury testimony, he did not . . . attempt to learn the identity of Dowdle's 'beau.' During closing arguments, both the state and [Sherman] pointed to trial evidence on the disputed question of whether the petitioner was away from Belle Haven between the hours of approximately 9:15 and 11:15 p.m. In [its] challenge to the petitioner's alibi claim, [the state] . . . argued that all the alibi witnesses were related to the petitioner, a point that was echoed by the court in its charge regarding the credibility of witnesses and in the specific context of the petitioner's alibi claim." (Footnote omitted.)

In his habeas petition, the petitioner claimed that Sherman was deficient insofar as he did not identify and present the testimony of Dowdle's "beau," who may have been able to provide additional information about who was at the Terrien home on the night of October 30, 1975. In support of his habeas claim, the petitioner presented the testimony of Ossorio, the "beau" referenced by Dowdle, who testified that he had seen the petitioner at the Terrien home. The habeas court gave the following description of Ossorio's habeas trial testimony: "Ossorio, [who was] seventy-two years old [at the time of the habeas trial], testified that, in 1975, he, as a psychologist, was operating a program for women. He indicated that he then had a personal connection to Dowdle and that he had been at the Terrien home in the evening hours of October 30, visiting with Dowdle and her daughter. He testified that, while there, he had visited with the Skakel brothers, including the petitioner, and Terrien, while they were watching [Monty Python's Flying Circus (Monty Python)] on television. He indicated that he was in and out of the room where the others were watching Monty Python while Dowdle was putting her daughter to bed. Finally, he indicated that he left the Terrien residence at about midnight and was not sure whether the Skakels had left before him. Thus, Ossorio's testimony sup-

ported the petitioner's claim that, during the likely time of the murder, the petitioner was away from [the] Belle Haven [neighborhood], as he indicated."

The habeas court found that "Ossorio was a disinterested and credible witness with a clear recollection of seeing the petitioner at the Terrien home on the evening in question. He testified credibly that not only was he present in the home with Dowdle and that he saw the petitioner there, but that he lived in the area throughout the time of the trial and would have readily been available to testify if asked. He indicated that, while he was aware of the general parameters of the state's claim against the petitioner, he did not pay close attention to the trial, and he did not come forward because he was unaware of the significance of the particular information he possessed. He indicated that he had not been contacted by . . . Sherman or by the state in conjunction with the investigation or trial. To the court, Ossorio was a powerful witness in support of the petitioner's alibi claim."

The habeas court concluded that Sherman's performance was deficient insofar as he did not identify Ossorio and present Ossorio's testimony at the petitioner's criminal trial. According to the habeas court, "[e]ven though . . . Sherman testified at the habeas [trial] that the petitioner had never informed him of Ossorio's presence and, indeed . . . had never heard Ossorio's name until shortly before the habeas [trial], he was on notice from Dowdle's grand jury testimony that she was in the company of another person at the Terrien home, and she had identified this person as her 'beau.' . . . Had . . . Sherman read and considered Dowdle's grand jury testimony, which was made available to him before the trial, he would have learned of the presence of an unrelated person in the Terrien household. And, had . . . Sherman made reasonable inquiry, he would have discovered Ossorio and gleaned that Ossorio was prepared to testify that the petitioner was present at the Terrien home during the evening in question. He would have learned, as well, that Ossorio was a disinterested and credible witness." The court added that Sherman's failure to identify and call Ossorio as a witness could not be attributed to a strategic decision because the petitioner had asserted an alibi defense about which other family members had testified, and, therefore, "Sherman's failure to follow up on information available to him in support of that defense, that there was an unrelated and identifiable person in the Terrien home in addition to Skakel relations, was deficient because [Sherman] knew or should have known of the presence of an unrelated person in the Terrien home under the particular circumstances of this case."

The habeas court also concluded that Sherman's failure to present Ossorio's testimony prejudiced the petitioner's alibi defense because there was a reasonable

probability that, if the jury had heard his testimony together with the petitioner's other evidence suggesting that the victim may have been killed when the petitioner was allegedly present at the Terrien home, it would have found the petitioner not guilty.

The respondent argues that Sherman's performance should not be deemed deficient because of Sherman's failure to attribute significance to a passing reference to Dowdle's "beau" in a transcript in light of the information known to Sherman at the time. Specifically, the respondent argues that the information Sherman learned of during his investigation indicated that Rushton Skakel, Jr., John Skakel, and their cousin Terrien were the only people who claimed to have watched television with the petitioner at the Terrien home and who could verify his presence there, and, despite Sherman's repeated inquires, none of them indicated to Sherman that anyone else was with them or could verify the petitioner's presence at the Terrien home that evening. The respondent also argues that, even if Sherman's performance was deficient insofar as he failed to investigate and to call Ossorio as a witness, the petitioner has failed to show prejudice because Ossorio's testimony, even if credible, provides only a *partial* alibi. According to the respondent, the physical evidence indicates that the victim may have been murdered after the time when the petitioner would have returned from the Terrien home, that some of the petitioner's own incriminating statements indicate that he saw her later in the evening, and that the petitioner's evidence of a commotion in the neighborhood is hardly persuasive given that it was mischief night and teenagers were out around the neighborhood.[20] The respondent also notes that several aspects of Ossorio's testimony were inconsistent with other testimony in the case, which might have led a jury to discredit Ossorio, notwithstanding the habeas court's conclusion that he was a credible witness. We agree that Sherman's performance was not deficient by virtue of his failure to identify and call Ossorio as a witness, and we do not consider whether that alleged deficiency prejudiced the petitioner.

2

Analysis

The petitioner's claim is one of inadequate investigation. The petitioner asserts that Sherman's performance was deficient because he unreasonably failed to investigate the identity of Dowdle's "beau" and consequently did not learn of his potentially exculpatory testimony and call him as a witness. To establish deficiency for failure to identify and call a witness in support of a defense, a petitioner generally must show that his attorney was informed of the existence of the witness, the substance of the testimony the witness might have to offer, and that the testimony would likely be helpful. See, e.g., *State* v. *Talton*, 197 Conn. 280, 297–98, 497 A.2d

35 (1985) ("[A petitioner claiming ineffective assistance for failure to call a witness must show that he] informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial. The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it.").

Sherman's failure to identify and call Dowdle's "beau" as an alibi witness was not unreasonable under the circumstances. There is no evidence that Sherman was aware, at any time prior to the petitioner's criminal trial, of Ossorio's existence or that he might have helpful information to give in support of the petitioner's alibi defense. As part of his work to develop the petitioner's alibi claim, Sherman undertook an investigation to identify potential witnesses who were with the petitioner at the Terrien home on the night of October 30, 1975, and who could verify the petitioner's presence there.[21] Sherman testified at the habeas trial that he had specifically asked his client "on many occasions" who else was at the Terrien home watching television on the night of October 30, but the petitioner did not tell Sherman that Ossorio was present at the Terrien home that night, or that Ossorio might be able to support the petitioner's alibi claim.[22] In addition, no one else who claimed to have been watching television with the petitioner at the Terrien home that night had ever mentioned that Ossorio was also there, either to investigators or to Sherman. Three others were supposedly with the petitioner watching television that night— Rushton Skakel, Jr., John Skakel, and their cousin, Terrien. Sherman interviewed each of them when preparing for trial, but Sherman testified at the habeas hearing that none of them mentioned Ossorio or suggested that Ossorio was with them that night. They had also been interviewed by the police in the weeks after the murder, but reports of interviews naming those present at the Terrien home that night similarly contain no mention of Ossorio or that anyone else was watching television with them. Indeed, even at the criminal trial, when Rushton Skakel, Jr., was specifically asked who else was in the room watching television beside himself, the only persons he named were Terrien and his brothers, John Skakel and the petitioner. If Ossorio had come in and out of the room where the others were watching the television show and spoke with them, as he claimed, he certainly would have been observed by them; yet, none of them mentioned him to investigators or to Sherman. Nor did Dowdle tell Sherman about the possibility that anyone else beside Rushton Skakel, Jr., John Skakel, and Terrien could corroborate the petitioner's presence at the Terrien home. Indeed, Sherman was asked at the habeas trial: "Did [the petitioner] or any of his brothers or his cousin [Terrien] or his cousin [Dowdle] ever tell you that there was a man watching [television]

with them at the [Terrien] house that night?" Sherman responded: "No." Sherman was then asked: "Did they ever give you any indication that there was anybody at the house who could corroborate the alibi?" Sherman answered: "Other than the family members, no."[23] In sum, neither the petitioner, nor Rushton Skakel, Jr., John Skakel, or Terrien, who told Sherman that they were with the petitioner at the Terrien home, ever suggested to Sherman the possibility that there was *anyone else* who might have verified the petitioner's presence at the Terrien home that night, despite Sherman's inquiries; to the contrary, the information that Sherman received indicated that Rushton Skakel, Jr., John Skakel, and Terrien were the only witnesses who could claim to have seen the petitioner at the Terrien home that night.

As a result, the only way Sherman could possibly have discovered Ossorio was through the singular reference in the grand jury transcript to Dowdle's "beau." When Dowdle was asked during the grand jury proceedings whether she recalled seeing her brother, Terrien, on the night of October 30, 1975, she responded: "I'm not sure that I saw him. I think I heard him. I was in my mother's library, which [is] off the living room, and I was in there with my beau at the time, and I didn't really venture out." She said nothing else about him to the grand jury. She also testified, however, that she heard voices of the Skakel brothers, but could not be sure who the voices belonged to and could not recall who was there, apparently because she had not left the library. Dowdle's passing reference is the *only* reference to her "beau" in the materials that were available to Sherman before trial. The petitioner has not identified any other mention of her "beau" during the grand jury proceedings or in any of the hundreds of pages of materials disclosed by the state to the defense prior to the petitioner's criminal trial.

Sherman was not present during the grand jury proceedings but had access to the transcripts and testified at the habeas trial that he had reviewed them. Sherman testified at the habeas trial that, in light of Dowdle's grand jury testimony and the information from the petitioner, Rushton Skakel, Jr., John Skakel, and Terrien, he "had no reason to suspect that [the "beau"], in fact, would be helpful" in establishing whether the petitioner was at the Terrien home on the night of October 30, 1975, even if Ossorio had been present somewhere inside the Terrien home.

Sherman did not act unreasonably in failing to attribute significance to or to further investigate this singular reference. Dowdle's single mention of her "beau" itself cast doubt on the likelihood that he might have seen who was at the Terrien home that night. Her testimony strongly suggested that, because she was together with her "beau" in the library and did not venture out

or see Terrien or the Skakels, neither did her "beau."[24] Sherman thus could reasonably have concluded that her "beau" had also not seen any of the Skakels at the Terrien home that night and that, more than twenty years after the night in question, the "beau," having never been interviewed or come forward, likely would have no reliable memory of who was at the Terrien residence that evening.

The reasonableness of this conclusion is reinforced by the fact that neither the petitioner nor anyone else who was watching television at the Terrien home that night had ever mentioned the "beau" as being present, either to police investigators or to Sherman. Sherman's conclusion that Dowdle's "beau" had not seen the petitioner at the Terrien home that night was not speculation; it was the conclusion most consistent with information provided to Sherman by the petitioner, Terrien, Rushton Skakel, Jr., and John Skakel. Considered together with all of the information available to Sherman before trial, Dowdle's reference to her "beau" would seem unlikely to lead to helpful information. When assessing the reasonableness of counsel's investigation, we must apply "a heavy measure of deference to counsel's judgements" and uphold counsel's decisions as long as they find some reasonable basis in the record. *Strickland* v. *Washington*, supra, 466 U.S. 691. Although it is possible that some defense attorneys might have discerned some import from this reference and pursued it, despite the information received from their clients, "the right to counsel is the right to effective assistance, and not the right to perfect representation." *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 101, 52 A.3d 655 (2012). Counsel has not performed deficiently simply for failing to unearth every possible lead in a case. See, e.g., *Yarborough* v. *Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) ("[E]ven if an omission is inadvertent, relief is not automatic. The [s]ixth [a]mendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); cf. *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 681–87, 51 A.3d 948 (2012).

In these circumstances, we conclude that it was not unreasonable for Sherman either to overlook or disregard any potential significance of this singular reference in the grand jury transcripts in light of the information Sherman had learned from the petitioner and others during his investigation, which indicated that no one else beside Rushton Skakel, Jr., John Skakel, and Terrien were with the petitioner watching television at the Terrien home on the night in question. See *Strickland* v. *Washington*, supra, 466 U.S. 691 ("when a defendant has given counsel reason to believe that pursuing certain investigations will be fruitless . . . counsel's failure to pursue those investigations may not later be challenged as unreasonable").

Our conclusion is consistent with the decisions of several federal courts that an attorney's performance is not deficient as a result of the attorney's failure to identify and interview witnesses when the defendant has not given their names and addresses to counsel or advised counsel that the witnesses might possess potentially exculpatory information. For example, in *United States* v. *Farr*, 297 F.3d 651 (7th Cir. 2002), in which the defendant claimed that his attorney's performance was deficient because he failed to locate and interview several witnesses, even though the defendant had not given his attorney their names and addresses or advised him of specific exculpatory information they might possess, the court concluded: "A defense attorney is not obligated to track down each and every possible witness or to personally investigate every conceivable lead. . . . An ineffective assistance of counsel claim cannot rest [on] counsel's alleged failure to engage in a scavenger hunt for potentially exculpatory information with no detailed instruction on what this information may be or where it might be found." (Citation omitted.) Id., 658.

The Eighth Circuit Court of Appeals reached the same conclusion in *Battle* v. *Delo*, 19 F.3d 1547, 1555 (8th Cir. 1994), amended on other grounds, 64 F.3d 347 (8th Cir. 1995), cert. denied sub nom. *Battle* v. *Bowersox*, 517 U.S. 1235, 116 S. Ct. 1881, 135 L. Ed. 2d 176 (1996). In *Battle*, the court determined that counsel's failure to call a potential witness when the witness was listed once in the police reports by her first name and once by her first name and incorrect last name did not constitute deficient performance. Id. The court reasoned that the petitioner did not provide counsel with the name of the potential witness before trial, did nothing to help counsel locate those who could assist in his defense, and there was no evidence that counsel had notice of the identity of the witness. Id.; see also *Harris* v. *Bowersox*, 184 F.3d 744, 756–57 (8th Cir. 1999) (failure to call eyewitness when name of witness was listed in police report by first name, age, and by first and incorrect last name did not constitute deficient performance under *Battle* when counsel was not made aware of existence of witness before trial), cert. denied, 528 U.S. 1097, 120 S. Ct. 840, 145 L. Ed. 2d 706 (2000).

Like the defendants or the petitioners in these federal cases, the petitioner in the present case and his family members not only failed to provide Sherman with Ossorio's name, but never suggested that they saw Dowdle's unnamed "beau" at the Terrien home or that the unnamed "beau" could provide testimony that would have corroborated his alibi. See, e.g., *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 817, 837 A.2d 849 (counsel's performance was not deficient as result of his failure to investigate possible witness when client did not mention witness to counsel), cert. denied,

268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004).

Correspondingly, in cases in which courts have determined that counsel's performance was deficient for failing to investigate a potential alibi witness, counsel had been provided with the witness' identity and had reason to believe that the witness might have helpful information to give. Thus, this court determined in *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 664, that defense counsel's performance was deficient because the petitioner gave counsel the names of the potential witness as one of only two persons in the area where the crime occurred that the petitioner knew, which could have been significant in light of the petitioner's inability to explain where he was at the time of the shooting. In other words, it would have been logical for counsel to determine whether the petitioner was with the potential witness, who was named by the petitioner, when the murder had occurred. See id., 683–87; see also *Mosley* v. *Atchison*, 689 F.3d 838, 849 (7th Cir. 2012) (failure to investigate and call two alibi witnesses known to counsel who would place petitioner across street at time fire started amounted to deficient performance); *Vazquez* v. *Commissioner of Correction*, 107 Conn. App. 181, 185–87, 944 A.2d 429 (2008) (failure to call alibi witnesses known to counsel who would testify that petitioner was asleep in his apartment at time of armed robbery amounted to deficient performance). In the present case, the incredibly limited information available to Sherman about Dowdle's "beau" indicated that he likely would be of little help to the petitioner's defense, especially considering that neither the petitioner nor anyone who was allegedly watching television with the petitioner at the Terrien home mentioned his presence there.[25]

Furthermore, the dissent relies on, among other cases, a Second Circuit case, namely, *Pavel* v. *Hollins*, 261 F.3d 219 (2d Cir. 2001), which, according to the dissent, demonstrates that the petitioner in the present case is entitled to relief. The dissent quotes the case at length but omits with ellipses the portion of the decision in which the court explains that defense counsel in that case was specifically made aware, in advance of trial, both of the identity of the witness and the important information the witness had to give—facts that distinguish *Pavel* from the present case. See id., 220 ("[Defense counsel] was familiar with the basic contours of [the witness'] testimony before the trial—presumably because he had spoken about the matter with [his client]. But [defense counsel] never [followed up] on what he learned of [the witness'] putative testimony with [the witness] herself . . . ."). If the petitioner, Rushton Skakel, Jr., John Skakel, or Terrien had told Sherman that Ossorio was with them and had seen the petitioner at the Terrien home on the night of October

30, 1975, *Pavel* might be more analogous to the present case. Of course, the information available to Sherman from those allegedly with the petitioner at the Terrien home that night indicated that no one else was with them and that Dowdle's "beau" thus had not seen the petitioner that night and could not corroborate his alibi. We therefore find *Pavel*—and for similar reasons the remaining case law on which the dissent relies—to be inapposite to the factual circumstances of the present case.

In sum, given the strong presumption that counsel has rendered adequate assistance, and relying on the well established principle that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"; (internal quotation marks omitted) *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 577, 941 A.2d 248 (2008); we conclude that the habeas court incorrectly determined that Sherman's performance was deficient under the first prong of *Strickland*. We thus need not address the issue of prejudice.

## D

### Failure To Call Witnesses To Impeach Gregory Coleman's Testimony

The habeas court also faulted Sherman for failing to locate, investigate, and call three witnesses who might have impeached the testimony of Coleman concerning one of the petitioner's confessions. The respondent argues that this conclusion was incorrect because Sherman's performance did not fall below an objective standard of reasonableness. We agree with the respondent that Sherman's performance was not deficient and therefore not ineffective. Although Coleman provided evidence that the petitioner had confessed to murdering the victim, Sherman acted reasonably in concluding that he could sufficiently attack Coleman's credibility directly through cross-examination and without the need to pursue additional witnesses.

### 1

### Additional Background

Coleman testified for the state at a number of pretrial hearings in the petitioner's criminal case, including before the grand jury, at the petitioner's juvenile transfer hearing, and again for two days at the petitioner's probable cause hearing. He testified that the petitioner had explicitly confessed to murdering the victim. Coleman died about one year before the petitioner's criminal trial, and, thus, he did not testify before the jury. Instead, the state had his probable cause hearing testimony read into the record at the criminal trial.

At the probable cause hearing, Coleman testified that he had been a resident at Elan when the petitioner was also a resident there. While there, he was assigned to guard the petitioner one evening because the petitioner had tried to escape from the facility. Coleman testified that, during that evening, the petitioner told him that he was going to get away with murder because he was a member of the "Kennedy" family. Coleman asked the petitioner what he meant, and, according to Coleman, the petitioner explained that "he had made advances [toward] this girl where he lives and that she spurned his advances and that he drove her skull in with a golf club." Coleman also claimed that the petitioner told him that the attack occurred in a wooded area, the golf club had broken during the attack, and that, two days after the murder, he "had gone back to the body and masturbated on [it]." Coleman also recalled another occasion at Elan when the petitioner was in a group therapy session, the subject of murder was brought up, and the petitioner was instructed to repeat the words "I am sorry" as a means of "get[ting] in touch" with his feelings of guilt.

Sherman cross-examined Coleman at the probable cause hearing and obtained a number of admissions from Coleman that raised questions concerning the truthfulness of his testimony about the petitioner's confession and his credibility as a witness generally.

Coleman admitted under questioning that his testimony at the probable cause hearing was different from his testimony at prior hearings and that his recollection about the petitioner's confession had changed. At the prior grand jury hearing, Coleman testified that the petitioner had personally confessed to him five or six times. At the probable cause hearing, however, Coleman claimed that the petitioner confessed only twice—once when Coleman was guarding the petitioner, and another time when the petitioner was instructed to apologize for the murder during a group therapy session, which Coleman thought was akin to a confession. At the earlier grand jury hearing, Coleman also testified that the petitioner said that he had used a driver type of golf club to attack the victim. But, during the probable cause hearing, Coleman testified that the petitioner had not said anything about the type of club used and claimed that it was just Coleman's "impression" that the petitioner had used a driver based on the petitioner's statement to Coleman that he "drove" the victim's skull in.[26] And, as another example, Coleman told the grand jury that the petitioner had confessed while he and the petitioner were talking about their families and why they had been sent to Elan. But, at the probable cause hearing, Coleman denied that he had been talking to the petitioner when the petitioner confessed. Instead, Coleman related that he had neither met nor spoken with the petitioner before he confessed, and he claimed that

the petitioner's comment about getting away with murder because he was a part of the "Kennedy" family was the first thing the petitioner ever said to him.

Coleman blamed the changes in his story on a "[l]apse of memory." Under questioning, Coleman acknowledged that his recollection was "questionable" at times because his conversation with the petitioner had occurred more than twenty years before and because he had heavily abused illegal drugs for many years in the interim. He admitted that he was high on heroin when he testified before the grand jury, having injected himself with the drug at his hotel about one hour before he testified. On the second day of his probable cause testimony, Coleman also disclosed under questioning that he had been ill from opiate withdrawal on the first day of his probable cause testimony and, afterward, had to be taken to the hospital for methadone treatment. He also admitted to having last used heroin just two days before he testified at the probable cause hearing.

Sherman also questioned Coleman about his delay in coming forward with the petitioner's confession. Although Coleman claimed that the petitioner confessed sometime in 1978, Coleman said he did not remember telling anyone about the confession until twenty years later. Coleman explained that, sometime in 1998, he was with his wife watching a "tabloid" television show about the murder when he remembered the petitioner's confession from twenty years before and told his wife about it. He did not call the police after remembering but, instead, called a national television network after seeing yet another television program about the case, and, when he did not reach anyone at the network, he called a local television station. Coleman was interviewed by the local station about his role in the case before he gave his probable cause testimony. He also testified that he had watched three separate television programs about the case before testifying at the probable cause hearing and admitted that he could not be sure that his memory was unaffected by the content of the programs. When Sherman asked if anyone else could verify his claims about a confession, Coleman said that someone else had guarded the petitioner with him when the petitioner confessed. He gave the names of three individuals who might have been the other person there—John Simpson, Alton Everette James, or Cliff Grubin—although Coleman said that he could not remember who was there and did not know whether the other person had even heard the petitioner's confession.

With respect to Coleman's character for truthfulness, generally, Sherman elicited admissions from Coleman that he was a frequent user of illicit drugs, had been convicted of committing multiple crimes, and had even served prison time in New York. Coleman also acknowledged that, after investigators for the state contacted

him about his story, he asked them to help with criminal charges he had in New York and for financial assistance from the state, although he said he never received either.

The petitioner's counsel elicited testimony during the habeas trial that Sherman, in preparing for the petitioner's criminal trial, directed his investigator to look for Simpson, James, and Grubin, but the investigator was not able to locate or contact them before the criminal trial, and thus Sherman did not learn the content of any testimony they might have been able to provide. Neither the petitioner nor the respondent asked the investigator at the habeas trial about the extent of the efforts he used to find these witnesses; the investigator testified only that he was directed to locate them, he made efforts to do so, was unable to find them, and that no further efforts were made after that. Despite not finding the witnesses, Sherman testified during the habeas trial that he did not believe that their testimony would have made a difference, even if it would have been favorable to the petitioner. According to the habeas court, Sherman felt that "he so completely destroyed Coleman's credibility on cross-examination that he believed no reasonable jury would credit [Coleman's] tale."

At the petitioner's criminal trial, the court allowed Coleman's probable cause hearing testimony, including Sherman's cross-examination of Coleman, to be read into the record before the jury. Sherman relied on his cross-examination of Coleman as the means of attacking the credibility of his claim that the petitioner had confessed. Neither the state nor Sherman presented testimony at the criminal trial from any of the three individuals who Coleman thought might have been the person guarding the petitioner when the petitioner confessed. To support Coleman's credibility, however, the state presented testimony at trial from Coleman's widow, who testified that Coleman had twice told her that someone named "Mike Skakel" from Elan had confessed to murder. She claimed that Coleman first told her about the confession when they were dating in 1986, and then again in 1998 when Coleman saw the "tabloid" television show about the murder.

Also, during the criminal trial, another witness came forward for the first time and claimed that Coleman told her about the petitioner's confession sometime in 1979. The state called her as a rebuttal witness. The witness testified that, while she and Coleman were both residents at Elan, Coleman told her that another resident, the petitioner, told Coleman he was related to the Kennedy family and had murdered a girl with a golf club. She also testified that she thought Coleman was one of the "good people" at Elan, that she had shared secrets with him, and that, to her knowledge, he had kept those secrets in confidence. She also testified that it was common knowledge among Elan residents that

the petitioner was there because he had murdered someone.

In his habeas petition, the petitioner claimed that Sherman's representation was ineffective insofar as he failed to locate, interview, and call as witnesses the three individuals named by Coleman—Simpson, James, and Grubin. According to the petitioner, Sherman unreasonably relied on his cross-examination to discredit Coleman's testimony, and he argued that Sherman was required to call these three individuals as witnesses to contradict Coleman's story. The petitioner also claimed that Sherman's lapse prejudiced his defense because, if the jury had heard the testimony of these individuals, there is a reasonable probability that it would have discredited Coleman's testimony and found the petitioner not guilty.

In support of his claim, the petitioner presented testimony from the three individuals, which had been given during an earlier posttrial hearing. Each had testified that they had not heard the petitioner ever confess to the murder.

Notably, Simpson recalled having guarded the petitioner with Coleman one evening but disputed Coleman's claim that the petitioner had confessed while being guarded. Simpson explained that, while guarding the petitioner that night, he was busy drafting reports while Coleman watched the petitioner. At some point during the evening, Coleman exclaimed that the petitioner admitted to having killed a girl. Simpson asked the petitioner if it was true, but the petitioner denied it. Simpson asked Coleman why he thought the petitioner had confessed. Coleman explained that he had asked the petitioner if he killed a girl, apparently in response to rumors about the petitioner's involvement in a murder, but the petitioner did not deny responsibility and had smiled with a "shit eating grin . . . ." When Simpson pressed Coleman about his claim that the petitioner confessed, Coleman said that was the petitioner's "reaction, the fact that he didn't say no" in response to Coleman's question. Simpson acknowledged, however, that he had not paid attention to any of Coleman's conversation with the petitioner until Coleman exclaimed that the petitioner confessed. He also testified that he is deaf in his left ear and that Coleman and the petitioner had been to his left.

Simpson also recalled a separate occasion when, shortly after leaving Elan in 1980, he was speaking with the petitioner about the murder and asked him if he had killed the victim. According to Simpson, the petitioner said "[n]o, I didn't do it," and explained that he had been "drinking and partying that night" and that "[t]here were . . . times that I may not . . . remember . . . but I certainly don't remember doing anything like that."

The habeas court agreed with the petitioner and concluded that Sherman's representation was ineffective in that he failed to find and call as witnesses the three people who Coleman thought might have been with him when the petitioner confessed. Although the habeas court acknowledged the strength of Sherman's cross-examination, it nevertheless concluded that "Sherman's decision not to pursue Simpson, James, and Grubin reflected a significant and impactful lack of judgment." The habeas court also concluded that Sherman's deficient performance prejudiced the petitioner's defense: "Sherman's failure to investigate and present the testimony of [the three individuals] left the core of Coleman's testimony only tangentially challenged. . . . With [their] testimony . . . there is a reasonable likelihood that Coleman's testimony would have been discredited, substantially weakening the state's prosecution. In the absence of credible testimony from Coleman tying the petitioner to the murder, there is a reasonable likelihood that the outcome of the trial would have been different."

2

Analysis

Sherman did not succeed in locating the three potential witnesses named by Coleman, and so he used his cross-examination of Coleman from the probable cause hearing as the means of impeaching Coleman's testimony. The petitioner has, however, failed to prove that Sherman's efforts to locate the three individuals were unreasonable and that Sherman's decision to use his cross-examination of Coleman in the absence of the witnesses' testimony was deficient.

The law governing ineffective assistance of counsel claims gives counsel substantial discretion to decide how to present a defense; this discretion includes determining which evidence to present and which witnesses to call to support the defense. See, e.g., *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 521. Counsel's decisions must be based on reasonable investigations, but "counsel need not track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 683. Under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

judgments." *Strickland* v. *Washington*, supra, 466 U.S. 690–91. In addition, in assessing counsel's decisions about how to present a defense, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id., 689.

In the present case, the petitioner and the habeas court faulted Sherman for proceeding to trial without first locating any of the witnesses named by Coleman. The evidence presented at the habeas trial indicates, however, that Sherman *did* try to find them. Sherman, his associate Throne, and his investigator each testified that efforts were made to find these witnesses. The record lacks details, however, as to the extent of the investigation. The petitioner's counsel asked the investigator at the habeas trial whether he searched for the witnesses and whether he found them, but presented no evidence about what efforts the investigator made. Without that evidence, we cannot assess the reasonableness of counsel's investigation. There is, however, some evidence in the record indicating that the witnesses were extremely difficult to find, suggesting that Sherman's failure to locate them prior to the petitioner's criminal trial very well might not be the result of a poor search but due to the difficulty in locating those witnesses.[27]

The petitioner had the burden to present evidence demonstrating that Sherman's investigation was constitutionally inadequate. In the absence of this evidence, we must presume that Sherman performed competently. See id., 688–91. Without any evidence to establish that Sherman's efforts on behalf of the petitioner were unreasonably deficient, the petitioner has not met his burden of establishing that Sherman had failed to conduct a reasonable investigation.[28]

Moreover, because Sherman could not locate the witnesses before the petitioner's criminal trial, his decision to use his cross-examination of Coleman as the means to attack Coleman's credibility was reasonable. Because Coleman died before the criminal trial, Sherman would have known that any presentation of Coleman's assertions to the jury would be through his prior testimony from the probable cause hearing and would include his cross-examination. Sherman's cross-examination was strong and highlighted numerous, significant admissions from Coleman that raised questions about the truth of his claims and his credibility generally.

Under questioning by Sherman, Coleman admitted that he changed his story about what the petitioner had told him in several respects: that his memory was questionable and might have been affected by drug use; that he had been under the influence of heroin at a prior hearing and suffering from withdrawal at the probable cause hearing; that he did not tell anyone about the

petitioner's confession until after seeing a television show about the case decades later; that his first call to report the confession was to a television network and not to the police; that he could not be sure that what he saw on television had not influenced his memory; that he had asked the state for special treatment with pending criminal cases and for money in connection with his testimony; and that he was a convicted felon who had served time in prison. Coleman's admissions during cross-examination permitted Sherman to persuasively argue that Coleman was not a credible witness, that his story could not be trusted, and that he might have invented his claims after hearing about the case on television as a means to obtain attention, profit, or leniency with regard to pending criminal matters.

In addition, Sherman also would have known that, because of Coleman's death, his cross-examination would be presented to the jury as it happened at the probable cause hearing, without the state having any additional opportunity to alter its examination of Coleman to blunt the impact of his admissions or to block certain testimony through new objections to Sherman's questions. We also note that, unlike in other cases, in which we have found ineffectiveness for failure to present witnesses, Sherman's inability to locate the potential witnesses prior to trial did not prevent him from challenging Coleman's testimony. In cases in which we have found ineffectiveness, counsel's failure to locate or call certain witnesses has been deemed deficient when counsel's failure left a petitioner without the means to present certain defenses. For example, in *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 508–509, 517–18, counsel's failure to call certain witnesses known to counsel deprived the petitioner in that case of a "plausible" third-party culpability defense. And, in *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 673–74, 685–87, the petitioner gave counsel names of the only people he knew in the area where the crime was committed, but counsel did not interview them or present their testimony, and this failure deprived the petitioner of an alibi defense at trial. In the present case, by contrast, Sherman's use of his cross-examination, in light of his inability to locate Simpson, James, and Grubin, did not leave Coleman's testimony unimpeached—counsel had a strong means to impeach Coleman though critical admissions made by Coleman himself.

On the basis of the evidence in the habeas record, the petitioner has failed to prove that Sherman's inability to locate the potential witnesses was the result of professional incompetence and thus has not shown that his performance under the circumstances was unreasonable. We therefore disagree with the habeas court that Sherman's performance was constitutionally deficient in this regard.

## III

## THE PETITIONER'S ALTERNATIVE GROUNDS FOR AFFIRMING THE HABEAS COURT'S JUDGMENT

We have determined that the habeas court incorrectly concluded that Sherman's representation was ineffective for the three reasons identified previously. Consequently, we next must consider whether the habeas court's judgment may be affirmed on one of the alternative grounds urged by the petitioner. The petitioner has offered seven alternative grounds, claiming that Sherman rendered ineffective assistance for reasons in addition to those that we have already discussed. He has also claimed that he is entitled to habeas relief because Sherman had a conflict of interest in representing him. We conclude that none of these alternative grounds entitles the petitioner to habeas relief.

### A

### Alternative Grounds Relating to Third-Party Culpability Defense

The first alternative ground offered by the petitioner relates to his third-party culpability defense. The petitioner claims that, even if Sherman was not constitutionally required to implicate Thomas Skakel, Sherman should have done a better job in implicating Littleton and *also* should have implicated two other individuals. We reject these arguments.

### 1

### Sherman's Handling of the Defense Implicating Littleton

The petitioner claims that Sherman mishandled the defense implicating Littleton. His claim is based on a composite drawing created in the days after the murder and used at trial. The petitioner argues that the drawing depicts a person seen about one block away from the crime scene around 10 p.m. on October 30, 1975, at or around the time when the petitioner claims the murder likely occurred. According to the petitioner, the person depicted in the drawing resembles Littleton. Although the drawing was referenced in police reports that Sherman reviewed before trial, he did not specifically ask the state to produce it. The petitioner argues that Sherman should have obtained a copy of the drawing from the state before trial and used it to bolster his defense implicating Littleton by arguing that Littleton was spotted near the crime scene at about 10 p.m. that night, contradicting Littleton's claim that he was inside watching television at that time. Sherman's failure to do so, the petitioner contends, was constitutionally deficient performance that prejudiced his defense.

The habeas court rejected the petitioner's claim. It determined that Sherman's performance was deficient

but concluded that any deficiency did not cause any prejudice to the petitioner. According to the habeas court, the issue raised concerning the drawing was "somewhat of a nonstarter" because the drawing does not depict the person seen later at 10 p.m. but depicts someone seen earlier in the evening who had been cleared by the police of any involvement in the murder. Because the drawing was not of the person seen at 10 p.m., the habeas court concluded that it would be of no help in determining whether Littleton was the person seen walking in the area of the crime scene that night.

After reviewing the parties' briefs and the portions of the record pertaining to this claim, we agree with the habeas court's conclusion that the petitioner failed to establish prejudice. The habeas court explained that the police reports referencing the drawing strongly indicated that it depicted a local resident who was not involved in the victim's murder. Sherman thus reasonably could have decided that expending additional resources to track down the drawing would not be worth the effort. Moreover, as the habeas court concluded, even if Sherman's performance was deficient by virtue of his failure to obtain and use the drawing at trial, we agree that the drawing would not have helped the petitioner's defense for the reasons advanced by the habeas court. Because the petitioner has failed to show any prejudice, his claim cannot succeed, and we need not also consider whether the habeas court properly determined that Sherman performed deficiently. See *Strickland* v. *Washington*, supra, 466 U.S. 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the [petitioner] makes an insufficient showing on one. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

2

Sherman's Failure To Investigate Additional
Third-Party Suspects

The petitioner also raised a claim that Sherman's performance was ineffective insofar as he failed to investigate a tip received before trial that someone named Gitano "Tony" Bryant might have known who killed the victim. The information from Bryant also formed the basis of a claim the petitioner made in his new trial petition. See *Skakel* v. *State*, supra, 295 Conn. 465. The facts concerning Bryant's information are set forth in detail in our decision in the petitioner's appeal from the denial of his motion for new trial. Id., 468–77. For present purposes, it suffices to say that, after the petitioner's criminal trial, Bryant gave a statement to the petitioner's investigators in which he claimed to have been in Greenwich the evening of October 30, 1975, and that two of his friends who were with him

that night later confessed to him that they were responsible for the victim's murder. See id., 472. The petitioner claimed during the proceedings on his motion for a new trial that Bryant's story was newly discovered evidence, not known to the defense before trial. Id., 465. The trial court rejected the petitioner's claims based on Bryant's story; see id., 473–77; and we affirmed. Id., 522.

At the habeas trial, the petitioner contradicted his earlier position, claiming instead that Bryant's story was not new information but was known to Sherman before the petitioner's criminal trial. Accord-ing to testimony presented for the first time at the habeas trial, one of the victim's childhood friends, Marjorie Walker Hauer, called Sherman in the weeks before the criminal trial and alerted him to something she had heard from her brother, who was a friend of Bryant's. Hauer explained that her brother had told her that Bryant claimed to have been in Greenwich on the evening of October 30, 1975, with two friends, and that his friends admitted to Bryant that they killed the victim. Hauer testified that Sherman responded that he was aware of the story and that it was not credible, although Sherman could not recall this conversation when he testified at the habeas trial.

The habeas court credited Hauer's testimony and found that Sherman knew of the tip and performed deficiently when he failed to investigate it. Nevertheless, the habeas court concluded that Sherman's lapse did not prejudice the petitioner because, even if he had investigated, his efforts would not have provided any benefit to the defense. The court first explained that Sherman might not have been able to obtain any useful information from Bryant before the petitioner's criminal trial, noting that Bryant had later refused to repeat his story when placed under oath. The habeas court next concluded that, even if Bryant had given Sherman some information before trial, it likely would not have been enough to assert a third-party culpability claim against the two individuals whom Bryant named because the petitioner failed to prove that Sherman would have had enough evidence to directly connect those two individuals to the murder. Finally, the habeas court also concluded that, even if a jury heard Bryant's claims, it was unlikely to give them any credit. Bryant's claims were not meaningfully corroborated by other evidence and were, in fact, inconsistent with other evidence. Bryant also had a reputation for deceit.

Assuming without deciding that the habeas court correctly concluded that Sherman's representation was deficient, we agree with the habeas court that the petitioner failed to prove prejudice for the reasons given by that court. In addition to those reasons, we also observe that Bryant's statement to the petitioner's investigators likely would not have been admissible at trial, let alone sufficient to form the basis for a third-

party culpability claim. See *Skakel* v. *State*, supra, 295 Conn. 523–24 (*Zarella, J.*, concurring) (explaining why Bryant's out-of-court statements were inadmissible hearsay). We therefore agree with the habeas court's conclusion that, even if Sherman had pursued the tip he received, "it likely would not have been helpful to the petitioner." Because the petitioner has failed to show any prejudice from this alleged lapse, we reject this alternative ground for affirmance.

B

### Sherman's Handling of the Evidence About Why the Petitioner Was Placed at Elan

For his next alternative ground for affirmance, the petitioner claims that Sherman's representation was ineffective insofar as he failed to rebut the state's argument that the petitioner's family sent him to Elan because they thought he might be responsible for the victim's murder and thus wanted to keep him out of the Greenwich area and away from investigators. The petitioner claims that he was sent to Elan, not because of anything to do with the murder, but because of his poor grades in school and because he was charged with driving under the influence in New York. The petitioner argues that Sherman should have objected to the admission of evidence about why he was sent to Elan or, alternatively, presented evidence showing that he was sent to Elan for reasons entirely unrelated to the victim's murder. He argues that Sherman's failure to do either was unreasonable and prejudicial. We disagree.

The petitioner enrolled at Elan in 1978, about three years after the murder, when the petitioner was about seventeen or eighteen years old. It was at Elan that the petitioner purportedly made a number of inculpatory statements about the victim's murder, including his statement to Coleman that he had drove the victim's skull in with a golf club because she had spurned his advances.

At the petitioner's criminal trial, the state presented evidence about why the petitioner had been sent to Elan. The state first asked the petitioner's father, Rushton Skakel, Sr., about his placement there. Sherman objected to the state's question on the ground that it sought irrelevant information and inadmissible misconduct evidence, but the trial court overruled the objection. Nevertheless, Rushton Skakel, Sr., who was apparently suffering from dementia at the time of trial, could not remember the reason. The state later presented evidence from other Elan residents who claimed that the petitioner told them why he was sent to Elan. One witness, Rogers, testified that, while at Elan, the petitioner told her that his family might have placed him there because they were afraid he committed a murder in Greenwich and were trying to hide him from the local police. Another witness, Coleman, who had

testified that the petitioner confessed to killing a girl with a golf club, also testified that the petitioner had told him that he was sent to Elan because of the murder.

For his part, Sherman elicited testimony from the petitioner's sister, Julie Skakel, that the petitioner was enrolled at Elan because of problems he had in other schools that he attended. She explained that the petitioner had been diagnosed with dyslexia, had trouble listening in school, and that his inability to pay attention was perceived as a behavioral problem. She further testified that the petitioner had a "turbulent" relationship with their father at the time, and was abusing alcohol and illegal drugs, and had been dismissed from several other schools before going to Elan.

In its closing argument, the state acknowledged that the petitioner's behavior and substance abuse problems might have contributed to his enrollment at Elan, but the state also offered an additional reason. It argued that the petitioner's own statements to Rogers and Coleman established that he might have been sent there in part because of his role in the murder, providing additional evidence of his guilt.

The petitioner claims that Sherman's representation was ineffective in that he failed to defend against the state's evidence on this issue. The petitioner first argues that Sherman should have objected to the state's offering of evidence about why the petitioner was sent to Elan. He also argues that, in the absence of any such objection, Sherman should have presented information contained in a Greenwich police report indicating that the petitioner was sent to the school after being charged with driving under the influence (DUI) in New York. The report was based on information received from the Windham, New York police, and explained that the petitioner "was driving on a local road, at which time he was signaled by a standing police officer investigating an accident to stop, at which time [the petitioner] attempted to run down the police officer, fled the scene, was chased and eventually hit a telephone pole." After appearing in court, the petitioner pleaded guilty to motor vehicle charges and, "later that afternoon, [an airplane] arrived at the local airport, and [the petitioner] was handcuffed and taken by two attendants and a [physician] to [Elan] in Maine." The petitioner claims that Sherman should have used the information in this report to argue that the petitioner was sent to Elan solely because of his school problems and his DUI charge, and not because of any alleged involvement in the murder.

The habeas court determined that Sherman's failure to object to or to use the police reports constituted deficient performance but concluded that Sherman's deficient performance did not prejudice the petitioner because the reasons for the petitioner's placement at Elan were, at best, tangential to the question of the

petitioner's guilt.[29]

We conclude, contrary to the habeas court, that the petitioner failed to prove that Sherman's performance was deficient. First, Sherman *did* object when the state sought testimony on this subject, but the objection was overruled. And it was after this objection was overruled that the state elicited testimony from the Elan witnesses about the petitioner's own statements concerning the reasons he was sent to Elan. Second, as to Sherman's failure to present evidence about the petitioner's DUI charge, Sherman reasonably could have concluded that opening the door to the circumstances surrounding that charge would not be worth the risks. We do not know precisely why Sherman chose not to present evidence concerning the DUI charge because the petitioner's habeas counsel did not directly ask Sherman about it at the habeas trial.[30] Counsel did ask him why he chose not to put on other witnesses, including the Skakel family attorney, who might have explained the reasons that the petitioner was sent to Elan. Sherman responded that he was concerned about "opening doors" that might allow the state to introduce otherwise inadmissible misconduct evidence, including evidence that the petitioner suffered from psychiatric problems and had a history of cruelty toward animals. Counsel in Sherman's position reasonably could have concluded that introducing information from the police report about the DUI charge would present a similar risk. It likely would have permitted the state to put the report into evidence and to further inquire about its contents, thus putting before the jury evidence that the petitioner had once tried to run down a police officer with his vehicle. Because Sherman was able to elicit testimony that the petitioner's performance and behavior in school led to his enrollment at Elan, it would not be unreasonable for defense counsel to avoid presenting additional evidence on this topic that might invite the state to present otherwise inadmissible and potentially prejudicial misconduct evidence. We therefore conclude that the petitioner failed to prove deficient performance and do not address whether the habeas court correctly determined that the petitioner did not suffer prejudice from Sherman's failure to present evidence concerning the petitioner's DUI charge.

C

Sherman's Failure To Use Expert Testimony Regarding the Coercive Environment at Elan

The petitioner next claims that Sherman unreasonably failed to present expert testimony to explain how the coercive environment at Elan rendered any statements to other residents about his involvement in the murder unreliable. Testimony adduced at the petitioner's criminal trial established that, after the petitioner tried to escape from Elan, he was subjected to a "general meeting" before the other residents at which the facility

director confronted the petitioner about the murder and at which other residents were allowed to scream and curse at him. This meeting lasted several hours. The petitioner was later placed in a boxing ring, pummeled by other residents, and paddled by the director while being asked about the murder in front of other residents. The petitioner initially denied involvement in the victim's murder, but, after being subjected to repeated verbal and physical attacks, the petitioner cried and responded that he could not remember what had happened or that he might have been involved but did not remember, at which time the attacks would cease. As we noted previously, in addition to these statements made in a group setting, the petitioner also privately made inculpatory statements to certain other residents, including two separate admissions that he had killed the victim.

According to the petitioner, Sherman should have called an expert witness to explain to the jury that the psychological pressure and physical punishment imposed by the Elan staff forced the petitioner to adopt a compromise strategy, whereby he gave up denying involvement and instead claimed to have no memory of the murder, as a means to stop his adverse treatment by Elan staff and other residents. The petitioner also argues that Sherman should have presented expert testimony to cast doubt on the reliability of the testimony from Elan residents who claimed that the petitioner admitted his involvement in the murder.

To support his claim, the petitioner presented testimony from an expert at the habeas trial, Richard Ofshe, a psychologist, who testified that the coercive treatment at Elan likely forced the petitioner to stop denying involvement in the murder when he was confronted about it in group sessions as a means to avoid further punishment. Ofshe acknowledged, however, that his theory about the effect of Elan's coercive methods on the truthfulness of the petitioner's statements in group settings could not explain why he voluntarily made explicit confessions to other residents, like Coleman, in private settings.

The habeas court concluded that Sherman's representation was deficient insofar as he failed to present expert testimony on these topics but found that the petitioner was not prejudiced by Sherman's omissions. The habeas court determined that Ofshe's testimony might have helped explain why the petitioner claimed a lack of memory about the victim's murder in group settings but that his testimony would not have meaningfully assisted the jury in assessing the reliability of the testimony concerning the petitioner's inculpatory statements made in private settings.

After considering the arguments of the parties and reviewing the relevant portions of the record, we agree, on the basis of the reasons given by the habeas court,

with its determination that any expert testimony about the coercive nature of Elan's treatment of the petitioner would not have meaningfully assisted the petitioner's defense at trial. Certainly, there are situations in which expert testimony might be required to present a constitutionally adequate defense; see, e.g., *Michael T.* v. *Commissioner of Correction*, supra, 307 Conn. 100–101; but this case is not one of them. Expert testimony on this subject would have been of little additional value because there already was sufficient evidence before the jury about Elan's coercive methods. The jury was given firsthand accounts from other residents about the severe and even violent manner in which Elan's director and other residents treated the petitioner when confronted about the murder. Even the state readily conceded in its closing argument at the petitioner's criminal trial that Elan had a "concentration camp type atmosphere" that was "equivalent to the lower circles of hell." Expert testimony is not necessary to explain to a jury the commonsense notion that a person being accused of committing murder while being subjected to psychological and physical abuse might stop denying involvement in the crime and feign ignorance solely as a means to stop the abuse.

In addition, the importance of the evidence concerning the petitioner's statements during group sessions was limited, at best. During those sessions, the petitioner, while being psychologically and physically abused, did not confess to the murder but said only that he could not remember what had happened. Even the state acknowledged during closing argument that "it is perfectly clear [that] the [petitioner] admitted nothing in that awful general meeting." The more important evidence against the petitioner was the testimony that he had privately confessed to other residents. And we agree with the habeas court's conclusion that Ofshe's testimony "would not have been of particular use" in attacking the credibility of other Elan residents, including Coleman, who testified that the petitioner had made inculpatory statements to them in private settings rather than in coercive group settings. Indeed, hearing from an expert that the petitioner's private admissions were not consistent with the expert's coercion theory might have hurt the petitioner's defense. We therefore conclude that the habeas court correctly determined that the petitioner failed to prove prejudice, and we do not consider whether Sherman's performance in this regard was deficient.

## D

### Sherman's Performance During Jury Selection

The petitioner argues that Sherman also rendered ineffective assistance by not challenging a potentially biased juror who served on the jury at the petitioner's criminal trial. The petitioner claims that Sherman should have challenged the selection of a certain juror,

referred to as B.W.,[31] because (1) he was a police officer, (2) he knew one of the detectives who originally investigated the victim's murder, namely, James Lunney, (3) he thought that the testimony of Lee, who testified for the state, would carry "some weight" based on his reputation, and (4) Sherman had once cross-examined B.W.'s wife in a previous case and had successfully obtained accelerated rehabilitation for a client accused of assaulting B.W. over B.W.'s objection. In support of his claim, the petitioner's habeas counsel submitted B.W.'s answers to questions during jury selection and questioned Sherman about his decision not to challenge B.W., but did not call B.W. as a witness during the habeas trial.

The habeas court determined that Sherman's representation was deficient insofar as he did not challenge B.W. for cause or, if that failed, for not using a peremptory challenge, because no reasonably competent defense attorney would have accepted B.W. as a juror. Nevertheless, the habeas court concluded that the petitioner failed to prove that he was prejudiced thereby. According to the habeas court, B.W.'s responses to Sherman's questions during jury selection indicated that his profession, familiarity with one of the state's witnesses, knowledge of Lee's reputation, and past encounters with Sherman would not impact his impartiality or prevent him from considering the testimony of all witnesses in the same, impartial manner.

We disagree with the habeas court's determination that Sherman's failure to challenge B.W. as a juror was constitutionally deficient. Counsel's choice in selecting jurors is a strategic decision entitled to great deference under *Strickland*. See, e.g., *Beverly* v. *Commissioner of Correction*, 101 Conn. App. 248, 252, 922 A.2d 178, cert. denied, 283 Conn. 907, 927 A.2d 916 (2007). Choosing a jury is as much an art as it is a science, and it requires counsel to rely on intuition in addition to the substance of the potential juror's answers to questions. See, e.g., *Lugo* v. *LaValley*, 601 Fed. Appx. 46, 49 (2d Cir.) (jury selection necessarily depends on counsel's "assessment of juror demeanor and credibility"), cert. denied, U.S. , 136 S. Ct. 110, 193 L. Ed. 2d 89 (2015); see also *Strickland* v. *Washington*, supra, 466 U.S. 693 (characterizing criminal defense as "an art"). Counsel is in a better position than a reviewing court to assess potential juror bias because, unlike the court, counsel was present at voir dire and able to gauge the juror's demeanor and sincerity in his responses. We therefore strongly presume that Sherman's decision not to challenge B.W. was reasonable.

The petitioner has not overcome this presumption. Just as any competent defense counsel would do, Sherman questioned B.W. at length about potential indicators of bias. Although there were certainly aspects of B.W.'s answers that might lead some defense attorneys

to assert a challenge, his answers to Sherman's questions provided a valid basis for Sherman to conclude that B.W. would nevertheless judge the case impartially.

When Sherman asked about whether B.W.'s profession as a police officer would impact his judgment, B.W. responded that he would be fair and consider all the evidence. He acknowledged that some defense attorneys might be hesitant to select a police officer but explained that his experience in law enforcement had taught him that there are "always two sides to a story" and that, when responding to a report of a crime, one must listen to "both sides . . . ." He also stated that he understood that both the state and defendants make mistakes. Moreover, he explained that he would find the petitioner not guilty if the state did not prove the petitioner's guilt beyond a reasonable doubt and was not troubled about what his fellow officers might think if he voted not guilty because he would explain to them, "you weren't in the courtroom, you didn't hear all the evidence . . . ."

With repsect to his familiarity with Detective Lunney, B.W. stated that he had known Lunney for about five years and that they met because they were members of the same motorcycle club. According to B.W., Lunney never discussed the investigation or any of the evidence in the case with him. B.W. represented that he would evaluate Lunney's testimony just as any other witness' testimony and denied that knowing Lunney would impact his decision.

Likewise, with Lee, although B.W. thought his reputation "carries some weight," he agreed that he would evaluate Lee's testimony based on its content rather than on Lee's reputation. He had never dealt with Lee in connection with a case but might have seen him give a lecture once. He agreed that the state's decision to call Lee as a witness did not alone indicate that its case was a strong one. In fact, B.W. explained that he could not remember which side Lee was testifying for until Sherman indicated that Lee was testifying for the state.

Finally, with respect to B.W.'s prior encounters with Sherman, B.W. acknowledged that he had known Sherman for about ten or eleven years, ever since Sherman represented a client charged with assaulting B.W. He recalled that Sherman helped his client get accelerated rehabilitation; B.W. acknowledged, however, that he had no bad feelings toward Sherman as a result of the case. B.W. also recalled that Sherman had cross-examined his wife and that she had been nervous about possibly being "intimated" or "grilled" because Sherman was a good attorney. B.W. explained, however, that his wife was neither intimidated nor upset with Sherman's cross-examination of her. In sum, B.W. testified to having no misgivings about serving as a juror in the case, and he represented that he would fairly consider the evidence presented by both sides and

would vote to acquit if the state failed to prove its case beyond a reasonable doubt.

Sherman's performance was not objectively unreasonable by virtue of his failure to challenge B.W. as a juror. Sherman questioned B.W. about potential grounds for bias, and B.W.'s candid responses indicated a thoughtful understanding of the role of a juror and the importance of impartially considering all the evidence presented in court before returning a verdict. Sherman was familiar with B.W. and had an opportunity to observe his demeanor in court. Certainly, some defense attorneys would have challenged B.W. as a juror, but we do not think that Sherman was constitutionally required to do so. Even the habeas court acknowledged that B.W.'s answers indicated a lack of any actual bias. Although it relied on that conclusion to determine that the petitioner failed to prove any prejudice, we think this conclusion also demonstrates that Sherman's decision not to challenge B.W. as a juror was not without a reasonable basis. Simply put, counsel's performance should not be deemed constitutionally deficient when he accepted a juror he reasonably believed would be unbiased. See, e.g., *Beverly* v. *Commissioner of Correction*, supra, 101 Conn. App. 252 (refusing to "second-guess" counsel's professional judgment to accept jurors on basis of their answers to questions about potential bias); see also *Lugo* v. *LaValley*, supra, 601 Fed. Appx. 49 (when no juror bias is shown, court is not precluded from recognizing counsel's acceptance of juror as reasonable, strategic decision).

In any event, it is clear that the petitioner also cannot prevail on this alternative ground because he has presented *no* evidence of prejudice. The petitioner argues that he has shown prejudice because Sherman's failure to challenge led to the seating of a biased juror. We disagree. Juror bias may be actual or conclusively presumed. See, e.g., *State* v. *Kokoszka*, 123 Conn. 161, 164–65, 193 A. 210 (1937). The petitioner has presented no evidence to prove any actual bias; the record is in fact to the contrary. The petitioner argues that we may presume that B.W. was biased given his answers to Sherman's questions, but there is no basis in the record to presume bias in this case. Bias will be presumed only when the juror has a close relationship with one of the parties, has an interest in the outcome of the case, had conferred with one of the parties about the merits of the case, or had formed an opinion about its merits. See, e.g., id., 164; see also *Lugo* v. *LaValley*, supra, 601 Fed. Appx. 49–50 (in case alleging ineffective assistance in jury selection, bias will be presumed only if juror is related to party or was victim of alleged crime). The petitioner has not proven any of these grounds for applying a presumption of bias in the present case. He therefore has failed to establish that Sherman's decision caused his defense any prejudice.

## E

## Sherman's Closing Argument

The petitioner next argues that Sherman's closing argument was constitutionally deficient and prejudiced his defense. The habeas court agreed that Sherman's closing argument was deficient, concluding that it was "disjointed, unfocused," that Sherman did not respond to certain aspects of the state's case, and that Sherman unreasonably made arguments that drew objections from the state. The habeas court nevertheless concluded that any deficiency in the closing argument did not prejudice the petitioner because the trial court had instructed the jury that it was obligated to focus on the evidence when deciding guilt, and the habeas court presumed that the jury followed the trial court's instructions. We disagree that Sherman's closing argument was constitutionally deficient.

Courts must be highly deferential when reviewing a claim that a closing argument was constitutionally ineffective. "[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should sharpen and clarify the issues for resolution by the trier of fact . . . but which issues to sharpen and how best to clarify them are questions with many reasonable answers." (Citation omitted; internal quotation marks omitted.) *Yarborough* v. *Gentry*, supra, 540 U.S. 5–6. "Even if some arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them. Focusing on a small number of key points may be more persuasive than a shotgun approach." Id., 7. We believe that the habeas court acknowledged but ultimately failed to apply this deference in its analysis.

Our review of Sherman's closing argument convinces us that it did not fall outside of the broad range of permissible arguments that counsel might make. Sherman was allotted ninety minutes of argument to cover fifteen days of testimony and evidence. In addition, because the state had given its closing statement immediately before Sherman, he could not simply give a scripted argument but needed to work in a rebuttal to the state's argument with no additional time to prepare it. Despite these constraints, Sherman's closing argument amply covered the evidence concerning the key issues in the case.

Sherman began his argument by summarizing the essence of the defense, emphasizing that the petitioner did not commit the crime and had never confessed. He attacked the state's case as a desire for a conviction in search of evidence rather than a search for the truth, noting that the state had gone through a number of prior

suspects before settling on the petitioner. Sherman also noted that the defense, in response to the state's case, had not tried to present a "boutique" defense using "high tech delivery" or "fancy theories." He emphasized that the state had not presented evidence to prove its claim that that the petitioner was "disturbed" or to demonstrate that he had become "a demonic killer one night on Halloween." He also contended that much of the testimony presented by the state's witnesses raised more questions than answers.

Sherman then turned to a critique of the physical and forensic evidence presented. He began by noting that the state had not presented any forensic or physical evidence to tie the petitioner to the murder. He reminded the jury that Lee acknowledged that there was no direct evidence to connect the petitioner to the crime, even though the killer would have been in close contact with the victim and likely would have been covered in blood after the assault. Sherman also recounted testimony demonstrating that the state was still testing forensic evidence just days before the trial began, and he argued that the state was apparently still trying to determine who was responsible for the crime, even though it already had put the petitioner on trial. Sherman candidly added that, although he did not know who committed the murder, the state's continued last minute forensic testing demonstrated that the state still did not know either. He noted that, although there was no physical evidence connecting the petitioner to the crime, Lee had explained that two hairs were found that potentially connected Littleton to the crime scene. With respect to the golf club used in the attack, which came from a set of golf clubs in the Skakel home, Sherman reminded the jury of testimony from one of the investigators that it was reported that golf clubs were often left outside all about the Skakel property. He reminded the jury that one of the police investigators admitted that the state's physical evidence against the petitioner was "zilch." As an aside, he added that that same investigator had once tried to obtain an arrest warrant for Thomas Skakel for the murder.

Sherman next addressed the state's argument that the petitioner had a motive to murder the victim. He attacked the state's theory that the petitioner murdered the victim after she rebuffed his romantic advances, pointing out that entries in the victim's diary and witnesses who knew the petitioner and the victim at the time established that the petitioner's feelings for the victim were that of an ordinary teenager, not a jealous murderer. Sherman also criticized the state for pulling its motive argument from theories pushed by a celebrity book written about the case for money and by tabloid magazines.

Sherman next pivoted to Littleton. Sherman acknowledged he did not know whether Littleton had committed

the crime but used uncertain evidence about whether Littleton had ever confessed to show that "a confession ain't always a confession" and that the evidence against the petitioner was no better than that against Littleton. He recounted evidence that the state had spent significant time trying to pin the crime on Littleton and argued that the state's attempts to secure a confession from Littleton laid bare the lengths to which the state would go to "get somebody to say, 'I did it.' " He also compared Littleton's uncertain confession to those that the petitioner supposedly made, arguing that Littleton's alleged confessions were no "less compelling" and no "less persuasive" than the "garbage" presented against the petitioner from Coleman and other witnesses who claimed the petitioner had made incriminating statements. Sherman then reminded the jury that Littleton himself admitted on the stand that he had told his former wife that he stabbed the victim in the neck.

Sherman then attacked the state's evidence with respect to the time of death. He criticized the state's experts for being unable to pin down a more narrow time frame for the victim's death and reviewed testimony from a number of witnesses, including the victim's mother, that there was a commotion and incessant barking by dogs sometime between 9:30 and 10 p.m. on October 30, 1975. He recalled testimony from the victim's mother that, around that time, she also thought she may have heard the victim's voice. To bolster the testimony from these witnesses, Sherman recounted the testimony of a medical examiner, who originally worked in connection with the state's investigation of the case and testified that the murder likely occurred about 10 p.m.

Tying the defense theory of the time of death to the petitioner's alibi, Sherman next reviewed the testimony establishing that the petitioner had gone to the Terrien home at about 9:30 p.m. and did not return until around 11 p.m., placing him out of the neighborhood during the time period he claimed that the murder had occurred. Sherman gave the jury reasons to credit the petitioner's alibi witnesses and explained why witnesses who thought that the petitioner had not gone to the Terrien home were mistaken in their recollection.

Sherman turned to attacking the state's theory that the Skakel family and possibly its attorneys had tried to cover up the petitioner's involvement in the murder and invent an alibi. The weekend following the murder, Littleton had taken many of the Skakel siblings to the family's vacation home in New York. The state argued that the purpose was to remove the petitioner from the investigation and insinuated that, during that trip, the Skakel family developed the petitioner's alibi story. But Sherman reminded the jury that Littleton testified that he, rather than the Skakel family or its attorneys, had brought up the idea of taking the Skakel siblings out

of town. He noted that police investigators initially had concluded that the petitioner was among those who went to the Terrien home. And Sherman also recounted how some of the Skakel siblings had candidly testified that they could not remember precisely who had gone to the Terrien home, indicating that, if there was a Skakel family conspiracy, it was "the worst run conspiracy [he had] ever seen."

Turning to the subject of the petitioner's confessions, Sherman went through each, detailing at length the reasons that each was not credible. For example, he noted that many of the witnesses had delayed decades in reporting the confessions, that some of the details they claimed the petitioner relayed to them were inconsistent with the evidence, that one witness recanted, that one admitted his recollection was questionable, and that many of them had questionable motives for coming forward, including the potential of receiving reward money. He recounted Coleman's history of drug use, including his drug use at the time he testified, as well as his criminal history. And he reminded the jury of the cruelty that the petitioner experienced at Elan to demonstrate why anything the petitioner said while he was there was wholly unreliable. Sherman also noted that, despite the harsh treatment of the petitioner at Elan, witnesses who were with the petitioner at Elan testified that he had continually denied any involvement in the murder.

On the subject of the petitioner's statements about his activities later on the night of October 30, 1975, including his claim of masturbating in a tree, Sherman rebutted the state's argument that the petitioner had changed his story about the tree in which he was sitting in order to potentially explain the presence of any DNA that might be found at the crime scene. He first explained why the petitioner did not initially tell the police about his activities during the initial investigation, indicating that the petitioner concealed his activities because he was afraid that his father would hear about them. He also recounted testimony from witnesses demonstrating that, once the petitioner revealed his activities that night, he was consistent with his story about which tree he was sitting in. Sherman explained that the argument that the petitioner had changed his story about which tree he was sitting in was based entirely on an assumption made by a witness about which tree the petitioner was referring to when he told his story on one particular occasion.

Sherman concluded by reminding the jury that the state had believed that other suspects committed the murder and spent years trying to build cases against them, and that the state finally settled on the petitioner, despite having no physical evidence to tie the petitioner to the crime. Sherman stressed that the state's case consisted solely of questionable claims that the peti-

tioner had confessed. He characterized the state's evidence as "not acceptable" for supporting a conviction because there were simply "too many questions" still surrounding the case. He cautioned the jurors that there were few times they would ever make a decision as consequential as deciding the petitioner's guilt and that they should not find the petitioner guilty on the basis of such little reliable evidence.

Sherman might not have had time to review all of the evidence presented in his closing argument, but he succeeded in addressing the critical evidence supporting his defense and responded to the key arguments raised by the state. The habeas court, in concluding that Sherman's argument was professionally incompetent, acknowledged that counsel is afforded substantial deference in formulating a closing argument given the broad range of options counsel has for argument and the constraints under which it is made, but we conclude that the habeas court did not apply that deference in its review of the petitioner's claim.

The habeas court characterized Sherman's closing argument as "disjointed" and "unfocused," but we do not share that view. To the contrary, Sherman organized his discussion of the evidence around the central topics of the petitioner's defense, focusing on his alibi, the competing evidence against Littleton, and the lack of credibility of the confession witnesses. Sherman also addressed other aspects of the state's case, including its theory of a family cover-up and the petitioner's alleged motive.

The habeas court faulted Sherman for his "failure to provide the jury a road map to an understanding of the state's burden of proof" and the concept of reasonable doubt, but we disagree that Sherman was incompetent in this regard. There is no requirement that defense counsel explain these concepts during closing argument. And counsel might reasonably conclude that doing so would be a poor use of limited argument time considering that the court provides its own detailed instructions about the concept of reasonable doubt to the jury. See *Yarborough* v. *Gentry*, supra, 540 U.S. 10 ("[t]o be sure, [counsel] did not insist that the existence of a reasonable doubt would require the jury to acquit—but he could count on the judge's charge to remind [the jury] of that requirement" [emphasis omitted]). Moreover, before Sherman gave his closing argument, the state had already acknowledged, in its initial closing argument, its burden to prove all allegations in the information beyond a reasonable doubt.

The habeas court also determined that Sherman's representation was ineffective insofar as he "fail[ed] to explain the relevance of the third-party culpability evidence [against Littleton] to the issue of reasonable doubt," but that assessment is belied by the record. As we already explained, Sherman used the evidence

against Littleton to explain that the evidence against the petitioner was no better. He also used it to discredit the integrity of the state's investigation by pointing out the investigators' role in attempting to extract a confession from Littleton. See footnote 9 of this opinion. He argued that the state's conduct vis-à-vis Littleton demonstrated that even the state could not be sure who committed the crime, and he urged the jury that there were simply too many questions outstanding to permit a guilty verdict. As the United States Supreme Court has observed, urging the jury that no one, not even the state, could be sure about who killed the victim is "the very essence of a [reasonable doubt] argument." *Yarborough* v. *Gentry*, supra, 540 U.S. 10.

The habeas court criticized Sherman for admitting that he did not know whether Littleton murdered the victim and for expressing some sympathy for Littleton, but such a tactic hardly bespeaks incompetence. Given the uncertainty surrounding Littleton's confession, counsel reasonably could have decided that blaming and degrading Littleton might have caused the jury to discredit the defense. Sherman did not act unreasonably in deciding that the better course was to candidly acknowledge the uncertainty surrounding Littleton's guilt and then to argue that the same uncertainty clouded the evidence against the petitioner. See id., 10–11 (counsel was not ineffective for acknowledging that he did not know truth about what occurred and arguing that no one else could be sure either). By doing so, he set up Littleton as a sympathetic victim of the state's desire to convict someone of the muder and then attempted to portray his client as another of the state's failed suspects.

The habeas court also determined that Sherman had failed to rebut the state's argument that the petitioner used his story about masturbating in a tree to possibly explain the presence of DNA if it were ever found, but, again, this is not supported by the record. As we explained, Sherman confronted this claim directly by arguing that the evidence on which the state relied to demonstrate that he altered his story was in fact nonexistent and based solely on unsupported assumptions.

The habeas court next observed that Sherman did not directly address the state's argument that the petitioner's family sent him to Elan to remove him from the police investigation. Although this determination is supported by the record, we disagree that it amounts to incompetence. Sherman can hardly be faulted for not spending valuable argument time addressing an issue that even the habeas court separately had concluded was "tangential to the main issues in the case." And Sherman indirectly addressed this throughout his closing argument when he argued that the state's theory of a Skakel family cover-up, which involved the pur-

ported invention of an alibi and concealment of evidence, simply was not supported by the testimony in the case.

Finally, the habeas court faulted Sherman for making improper comments during closing argument that caused the trial court to caution the jury to disregard the comments. For example, during his closing argument, the trial court twice interposed that the jury should disregard certain remarks Sherman had made. In addition, the state filed a motion after closing arguments, asking for additional curative instructions, which the trial court granted. According to the trial court, Sherman had stated that he did not know who murdered the victim, and the trial court instructed the jury to disregard that remark because it represented counsel's personal opinion. The trial court also instructed the jury to disregard Sherman's remark that the petitioner did not know who committed the murder because the petitioner had not actually testified, but the court further instructed the jury that it could draw no adverse inference from the petitioner's decision not to testify. Finally, the state asserted that Sherman had implied during his closing argument that the state attempted to conceal evidence by raising objections and failing to produce certain witnesses. The court instructed the jury that it should rely on its own recollection about whether Sherman made those arguments, and, to the extent he did, those arguments should not be considered during deliberations.

We disagree with the habeas court that these comments, which were made during a long and detailed closing argument, amount to professional incompetence. Although drawing objections of this type during a closing argument might not get counsel an "A" for trial advocacy, our task is not to "grade counsel's performance" but to determine whether counsel's actions fell below the acceptable range of professional performance. *Strickland* v. *Washington*, supra, 466 U.S. 697. Attorneys commonly ask questions and make comments during a trial that draw objections from the opposing party, and those objections are often sustained and can lead to curative instructions. In our view, Sherman's comments, while legally objectionable, demonstrated strong advocacy on Sherman's part and reflected mistakes that a reasonable attorney might make, not ineffective assistance.

F

Sherman's Failure To Attempt To Suppress an
Audio Recording of the Petitioner's
Statements to His Ghost Writer

At the petitioner's criminal trial, the state entered into evidence an audio recording of the petitioner narrating his activities on the night of October 30, 1975, to his ghost writer, Richard Hoffman. Hoffman was

helping the petitioner write an autobiography, which would include a chapter about the victim's murder. While the grand jury investigation was still pending, the state learned of the arrangement between the petitioner and Hoffman, including the intended chapter on the murder. At the state's request, the grand jury subpoenaed Hoffman to testify before the grand jury and to bring with him any materials in his possession relating to the petitioner's autobiography project, including any audio recordings. Detective Frank Garr went to Hoffman's residence to serve him with the subpoena. Although the subpoena only required Hoffman to appear and bring materials with him to the grand jury proceeding, Garr asked Hoffman to immediately turn over the materials in his possession that were requested in the subpoena. According to Hoffman, Garr told him he could do it "the easy way" by handing over the materials, or "the hard way," apparently by forcing Garr to get a warrant allowing Garr to seize them immediately. Hoffman testified at the habeas trial that, despite Garr's statement about the easy way or the hard way, he thought his entire discussion with Garr was otherwise amicable, and he turned over to Garr the materials, including the audio recordings later used by the state. Hoffman testified that he believed that he was required to turn them over because of the subpoena.

The petitioner claimed in his habeas petition that Sherman should have tried to have the audio recordings suppressed because they were the product of an illegal seizure. According to the petitioner, Hoffman and the petitioner had signed an agreement making the recordings the sole property of the petitioner and preventing Hoffman from disclosing information relating to the autobiography project. Thus, the petitioner claimed that he had an expectation of privacy in the recordings, which would have provided Sherman standing to challenge their illegal seizure by Garr. He also asserted that, if Sherman had moved for suppression, the trial court likely would have granted the motion, thereby preventing the state from using the recordings as evidence at the petitioner's criminal trial. If the recordings had been suppressed, the petitioner asserted, there is a reasonable likelihood that the outcome of the trial would have been different.

The habeas court agreed that Sherman should have tried to suppress the recordings but concluded that the petitioner had failed to prove prejudice. The court determined that Garr's seizure of the recordings was unlawful because he had "intimidated and coerced Hoffman" into surrendering the recordings immediately. The habeas court also concluded that, even though the recordings were seized from Hoffman, the petitioner would have had standing to challenge their seizure because of the confidentiality and ownership agreement giving the petitioner sole ownership of them. Nevertheless, because the petitioner had not shown that

the recordings would, in fact, have been suppressed, the habeas court found no prejudice. The habeas court determined that neither the petitioner's confidentiality agreement nor Garr's unlawful seizure would have prevented the grand jury from obtaining the recordings through its subpoena power, which would have led to their discovery and use by the state.

We do not address whether Sherman's representation was deficient insofar as he did not seek to suppress the recordings because we agree with the habeas court that, even if Sherman had sought their supression, the petitioner has not demonstrated that Sherman's effort would have succeeded, and, therefore, the petitioner has failed to show prejudice.[32] The petitioner, citing the exclusionary rule, claims that Sherman would have succeeded in suppressing the recordings because they were illegally seized and, therefore, would have been excluded from evidence. But, even if we accept the habeas court's determination that Garr's seizure of the recordings was unlawful, it is clear that a court would not suppress them because they would inevitably have been obtained by the grand jury pursuant to its subpoena power. The petitioner has not cited any authority to show that unlawful police activity nullifies a *preexisting* grand jury subpoena; relevant authority is to the contrary.[33] See, e.g., *United States* v. *Vilar*, 729 F.3d 62, 85 (2d Cir. 2013) (government can use subpoena to establish inevitable discovery exception to exclusionary rule), cert. denied, U.S. , 134 S. Ct. 2684, 189 L. Ed. 2d 230 (2014). The petitioner has not demonstrated that either he or Hoffman would have been able to quash the subpoena. The grand jury subpoena was issued before the allegedly unlawful police activity occurred, and the recordings sought were relevant to the grand jury's investigation. Irrespective of Garr's actions, the subpoena required Hoffman to appear before the grand jury and to turn over relevant materials in his possession, including the recordings. And there is no basis for concluding that the petitioner's private confidentiality and ownership agreement with Hoffman could prevent the grand jury from obtaining the evidence. Consequently, we agree with the habeas court that the recordings would have been admitted into evidence, even if Sherman had moved to suppress them. The petitioner has failed to show that Sherman's omission caused him any harm and, therefore, cannot satisfy his burden of demonstrating prejudice.[34]

IV

CONFLICT OF INTEREST CLAIM

Finally, we address the petitioner's separate claim that he was denied his sixth amendment right to counsel because his fee arrangement with Sherman presented a conflict of interest that prevented Sherman from properly representing the petitioner. The habeas court rejected this claim, and we agree with the habeas court's

resolution of this claim.[35]

The habeas court found the following facts relevant to this claim. The petitioner originally agreed to pay Sherman an hourly rate for his services and to cover all expenses incurred for the defense. Several years after Sherman began representing the petitioner, and about five months before trial, the petitioner and Sherman changed their billing agreement to a flat fee arrangement. In entering into this arrangement, the petitioner was represented by different counsel. Under the arrangement, Sherman was paid a flat fee to cover all outstanding amounts then owed to him and for his future services. Sherman was required to pay for any expenses incurred for the defense out of the flat fee payment that he was to receive from the petitioner. Sherman treated the funds as having been earned and transferred them to his firm's general operating account. Unbeknownst to the petitioner at that time, Sherman was behind in income tax payments to the Internal Revenue Service (IRS). The habeas court determined that Sherman's placement of the funds in the firm account, instead of a client funds account, put the funds at risk of being seized by the IRS, but the IRS never seized the funds.

The habeas court determined that the flat fee agreement and Sherman's handling of the funds created a "substantial risk" that Sherman would be burdened by a conflict of interest. First, the habeas court determined that the possibility that the IRS could seize the funds might prevent Sherman from paying defense expenses. Second, the habeas court determined that the up-front payment to Sherman created an incentive for him to minimize defense expenses, including expenses for expert witnesses and investigations, so that he could retain more of the funds to help pay his tax debt. Nevertheless, the habeas court determined that the petitioner could not prevail on his conflict of interest claim because he had not presented any evidence to demonstrate that the potential conflicts had any adverse impact on his defense.

After considering the briefs, the record, and the habeas court's decision, we conclude that the petitioner's claim must be rejected because, irrespective of whether Sherman was burdened by a potential conflict of interest, the habeas court correctly determined that the petitioner presented no evidence to establish prejudice.[36] To demonstrate that a conflict of interest denied a petitioner the effective assistance of counsel, he must show both that a potential conflict of interest existed and that his defense was adversely impacted on the basis of that conflict.[37] We agree with the habeas court that the record contains no evidence that either claimed conflict caused the petitioner any harm. The IRS did not seize the funds and thus did not prevent their use for defense costs. And, although the petitioner claimed

that Sherman had an incentive to avoid incurring additional expenses so that he could keep a greater share of the funds to pay his tax debt, the petitioner has presented no evidence to show that Sherman diverted funds for the defense to cover his tax debt, or that this concern caused Sherman to otherwise alter his defense strategy. Consequently, we agree with the habeas court that the petitioner's conflict of interest claim fails.

The judgment is reversed and the case is remanded with direction to render judgment denying the habeas petition.

In this opinion EVELEIGH, ESPINOSA and VERTEFEUILLE, Js., concurred.

* This appeal originally was argued before a panel of this court consisting of Justices Palmer, Zarella, McDonald, Espinosa, Robinson and Vertefeuille. Thereafter, Justice Eveleigh was added to the panel. Justice Eveleigh read the briefs and appendices, and listened to a recording of oral argument prior to participating in this decision.

* December 30, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The dissent reaches a contrary conclusion. Not comfortable relying on the facts as presented during the habeas trial, or the law governing ineffective assistance of counsel claims, the dissent attempts to distract the reader from both by characterizing the majority's analysis as "so blatantly one-sided as to call into question the basic fairness and objectivity of [that] analysis and [the majority's] conclusion," while at the same time misstating the majority's views. We will not rely on similar tactics.

[2] The victim's mother acknowledged that it was possible that the victim came home for a little while at about 9:30 p.m. on October 30, 1975, and then left again that night without her mother realizing that she had been in the house, athough the victim's mother could not recall whether the victim had done that previously.

[3] The petitioner's mother was deceased at the time.

[4] James Terrien also went by the name of James Dowdle. After being adopted by his stepfather, George Terrien, he used his stepfather's last name during his youth. Thus, throughout the criminal trial, most witnesses who had known him during that time referred to him as Jimmy Terrien, even though he was using his birth name of Dowdle by the time of the criminal trial and testified under the name of James Dowdle. We hereinafter refer to him as James Terrien, as the habeas court did.

[5] There was also evidence presented at the petitioner's criminal trial that one of the petitioner's brothers, John Skakel, heard someone in the mudroom of the Skakel home at about 11:30 p.m. on October 30, 1975. During their investigation, police investigators found other golf clubs from the set to which the murder weapon belonged in a barrel in the Skakel mudroom.

[6] The attorneys with whom Sherman consulted included, among others, F. Lee Bailey, William F. Dow III, Richard Emanuel, David S. Golub, David T. Grudberg, and Barry Scheck.

[7] Another one of the petitioner's brothers, John Skakel, testified that he had also gone to the Terrien home that night but that he could not recall many details about the evening when he testified at the criminal trial, including who exactly had gone to the Terrien home from the Skakel home. The court admitted into evidence, as a record of past recollection, a statement that John Skakel had given to the police in 1975, in which he explained that the petitioner had also gone to the Terrien home.

[8] The right to the effective assistance of counsel is also guaranteed by article first, § 8, of the Connecticut constitution. This section provides the same protection as the federal constitution, and the federal standard for judging effective assistance claims applies to any such claims under the state constitution. See, e.g., *State* v. *Arroyo*, 284 Conn. 597, 643, 935 A.2d 975 (2007).

[9] The jury must have discredited evidence that Littleton might have confessed. At the petitioner's criminal trial, Littleton testified during cross-examination by Sherman that Littleton had previously told his former wife, Mary Baker, that he had stabbed the victim in the neck. The state, however, presented evidence through Baker that Littleton had never actually con-

fessed to her that he committed the crime. She testified that she had been cooperating with investigators and had *told* Littleton that he had confessed to her during a drunken blackout in an attempt to elicit incriminating statements from him while investigators recorded the conversation between them.

The habeas court made no findings about whether Sherman was aware before trial of Baker's claim that she had made up Littleton's admissions. Notably, however, even Littleton did not know until after the petitioner's criminal trial had started that Baker apparently invented Littleton's supposed admissions or that his conversations with her were recorded.

[10] We are hard-pressed to understand what the "plethora" of evidence was in light of the habeas court's concession that the evidence presented to implicate Thomas Skakel would not have been admissible at the petitioner's criminal trial but would simply have provided "an investigative gateway" to possibly discovering admissible evidence. The admissible evidence that Sherman supposedly could have found was not presented at the habeas trial.

[11] Although the petitioner relied on this time of death during his criminal trial, the state argued at the trial that the time of death could have been later. Among other evidence, the state relied on testimony from the medical examiner indicating that the time of death could have been as late as 5 a.m. on October 31, 1975, and that a time of death of 1 a.m. would be just as consistent with the medical evidence as a time of death at 10 p.m. on October 30.

[12] Of course, even if Sherman had evidence of these details, it is far from certain that the trial court would have allowed Sherman to raise a third-party defense, or that Sherman could be faulted for failing to pursue it, given that there is no evidence that their encounter, if it occurred, was anything but consensual. Cf. *Mukhtaar* v. *Commissioner of Correction*, 158 Conn. App. 431, 448–50, 119 A.3d 607 (2015).

[13] Sherman testified at the habeas trial that Thomas Skakel mentioned having sexual contact with the victim but that he did not provide any specific details of the encounter, and Sherman could not recall any mention of the time it allegedly took place. For example, Sherman testified that Thomas Skakel had "basically repeated" the information in the Sutton Report during their meeting, but, when Sherman was asked whether Thomas Skakel had told Sherman "that [Thomas Skakel and the victim] engage[d] in sexual conduct, as reflected in the Sutton Report," Sherman answered, "I don't think he was as specific as [the Sutton Report], only that there was some sexual conduct." Even if we assume that Sherman's memory is more accurate than Throne's, the most that Sherman or Throne could have testified to was that Thomas Skakel admitted to having sexual contact with the victim on October 30, 1975, but without any details about when, where, or how it unfolded—details that, as we have mentioned, would have been necessary to establish the tenuous link, which the habeas court observed, between Thomas Skakel's statements in the Sutton Report and the crime scene evidence.

Nevertheless, Sherman's testimony about his own memory of an event that occurred eleven years beforehand cannot, itself, be used as proof of what Throne would have known and recalled about that event, or what the substance of Throne's testimony concerning that event would have been if Throne had been called as a witness at the petitioner's criminal trial. The petitioner does not argue that Sherman should have withdrawn from representing the petitioner one week before his criminal trial so that Sherman could testify about his meeting with Thomas Skakel.

[14] At the habeas trial, the petitioner's habeas counsel asked Throne whether Thomas Skakel had discussed his alleged sexual encounter with the victim during Sherman and Throne's meeting with Thomas Skakel. Throne replied: "I don't recall during that meeting talking about the, you know, the [sexual] contact. I am aware, obviously, from other reports of what, you know, had taken place, but I don't recall as I sit here today actually discussing that in detail when we were with [Thomas Skakel] at that time." When asked to clarify what other reports he was speaking of, Throne explained: "The information—or I believe, you know, it was reported that—I think they described it as mutual masturbation, so I believe we were aware of that information, but I can't recall . . . discussing that specifically with [Thomas Skakel] at that time at that meeting."

Sherman testified at the habeas trial that Throne had taken notes during their meeting with Thomas Skakel and that he believed that Throne may still have had the notes, but no such notes were entered into evidence at the habeas trial; nor did the petitioner's habeas counsel ask Throne whether

he had taken notes during that meeting, whether he still had them, or whether they might refresh his recollection.

[15] The habeas court briefly surmised that one of the investigators for Sutton Associates might have been able to testify about the details of Thomas Skakel's encounter with the victim on the basis of the interview between Thomas Skakel and Sutton Associates, but this assumption is nothing more than speculation.

Prior to trial, Sutton Associates invoked the attorney-client privilege and attorney work product privilege, thereby declining to testify about the content of its communications with Thomas Skakel. Even if we assume that Sherman could somehow have defeated a claim of privilege by Sutton Associates, the record is silent about the content of the testimony that a Sutton Associates investigator might have provided. No one from Sutton Associates testified about the content of Thomas Skakel's communications with Sutton Associates in any proceeding in this case.

Without additional evidence, we cannot assume that someone who interviewed Thomas Skakel would have been available to testify at the petitioner's criminal trial and that they would have testified in pure conformity with the alleged content of the Sutton Report. That report was not authenticated by anyone from Sutton Associates and was apparently drafted several years before the petitioner's criminal trial. See, e.g., *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 584, 941 A.2d 248 (2008) ("[i]n a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . but by demonstrable realities" [internal quotation marks omitted]); see also *Lewis* v. *Commissioner of Correction*, 89 Conn. App. 850, 860–61, 877 A.2d 11 (petitioner could not establish content of missing witness' testimony through seven year old statement when witness did not testify at habeas trial and petitioner presented no evidence that witness would have testified at criminal trial), cert. denied, 275 Conn. 905, 882 A.2d 672 (2005).

The dissent suggests that Sherman also could have called Emanuel Margolis, Thomas Skakel's attorney, who was also present at the meeting with Thomas Skakel, Sherman, and Throne, to testify about what Thomas Skakel had said during that meeting. This is entirely speculative. The petitioner did not present any evidence of what Margolis might have testified to if he had been called as a witness at the petitioner's criminal trial—Margolis passed away before the habeas trial—and the habeas court made no findings about whether Margolis would have been available or willing to testify, or what the substance of his testimony might have been. There is, therefore, no basis in the record for concluding that Margolis could have testified about the details of Thomas Skakel's encounter with the victim if Margolis had been called to testify at the petitioner's criminal trial. See, e.g., *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 584; *Lewis* v. *Commissioner of Correction*, supra, 89 Conn. App. 860–61.

[16] The habeas court itself also surmised that Sherman could have argued that Thomas Skakel suffered from psychological problems and had a violent temper, but, as the habeas court acknowledged, the petitioner did not present any evidence to support these assertions at the habeas trial that would have been admissible at the petitioner's criminal trial. Any reliance on this evidence would similarly be speculative. See, e.g., *Lewis* v. *Commissioner of Correction*, 89 Conn. App. 850, 860–61, 877 A.2d 11, cert. denied, 275 Conn. 905, 882 A.2d 672 (2005).

[17] Moreover, Littleton told the police during their investigation, and later testified at the petitioner's criminal trial, that he watched television with Thomas Skakel on the night of October 30, 1975, beginning at about 10:15 p.m., within twenty to thirty minutes after the time the petitioner now asserts that Thomas Skakel might have killed the victim. Littleton was clear, however, that, when he saw Thomas Skakel at about 10:15 p.m., Thomas Skakel was wearing the same clothes he had on earlier that evening, there was nothing suspicious about him, and there was no blood on his clothing. This information renders the petitioner's claim implicating Thomas Skakel, which rests on the assertion that he committed the murder between approximately 9:45 and 10 p.m. that night, all the more speculative.

[18] The notion that the petitioner might have murdered the victim after discovering that she had engaged in sexual activity with Thomas Skakel had also been raised in the media after the Sutton Report was leaked to media sources several years before the grand jury had convened to investigate the murder.

For example, before the grand jury convened in 1998 to investigate the victim's murder, retired Los Angeles Police Detective Mark Fuhrman pub-

lished a book about the crime and implicated the petitioner. Sherman testified at the habeas trial that he had read this book before the petitioner's criminal trial.

In the book, Fuhrman argues that the petitioner most likely killed the victim after discovering a sexual encounter between the victim and Thomas Skakel. M. Furhman, Murder in Greenwich (1998) pp. 197, 215. In support, the book includes the following quote, which it attributes to the Sutton Report: "We have found considerable evidence to show [that the petitioner] had been involved in a relationship with [the victim]. According to one source, [the petitioner] and [Thomas Skakel] even fought over her. Along the blurry lines of teenage romance, [the petitioner] was even known to be [the victim's] boyfriend for some time. Coupled with our extensive knowledge of just how vehemently they fought with each other, this information suggests [that the petitioner] had more than ample reason to [be] extremely upset when [Thomas Skakel] was carrying on with [the victim] by the side of the house just before 9:30 p.m." (Internal quotation marks omitted.) Id., p. 215. The book further quotes the Sutton Report as stating: "We know practically nothing of how [the petitioner] reacted to all this, and it is a glaring omission. For certainly, he had a reaction, and it may have been extreme." (Internal quotation marks omitted.) Id., p. 216.

[19] The petitioner argues that the testimony concerning his self-incriminating statements lacked credibility. Given the jury's verdict, however, the jury likely found them credible. Providing the jury with additional evidence corroborating these statements would have further bolstered their credibility to the jury.

[20] The state had argued at the petitioner's criminal trial, and the trial court instructed the jury, that it could find the petitioner guilty of the murder, even if it found that he went to the Terrien home, if it credited the state's evidence concerning the time of death rather than the defendant's.

[21] In addition to attempting to identify witnesses who were with the petitioner at the Terrien home, Sherman also identified and ultimately presented evidence at the criminal trial aimed at showing that the victim was murdered when the petitioner was allegedly at the Terrien home. That evidence included expert testimony from a forensic pathologist and testimony from witnesses who heard dogs barking and voices in the neighborhood sometime between 9:30 and 10 p.m. on October 30, 1975. See, e.g., *State* v. *Skakel*, supra, 276 Conn. 643 n.7; id., 652 n.14.

[22] The petitioner testified at the habeas trial that he gave Sherman the names of two persons, Ossorio and Ian Kean, who purportedly were boyfriends of Dowdle and could verify the petitioner's presence at the Terrien residence on the night of the murder, but the habeas court rejected this testimony when it referred in its memorandum of decision to the "failure of the petitioner to bring [Ossorio] to . . . Sherman's attention." The habeas court thus appears to have believed Sherman's testimony that he had asked the petitioner "[o]n many occasions" who else was at the Terrien house watching television and that he did not recall the petitioner ever telling him that Ossorio was there. The petitioner has not challenged the habeas court's conclusion as clearly erroneous on appeal. In addition, the petitioner did not call Terrien, Rushton Skakel, Jr., or John Skakel to testify at the habeas trial about whether they had recalled whether Ossorio was at the Terrien home, or whether they had ever had told Sherman that Ossorio might have been there that night.

[23] Sherman's associate, Throne, also testified at the habeas trial that neither the petitioner nor anyone else who claimed to have been with the petitioner at the Terrien house that night had mentioned the presence of Ossorio or any other nonfamily member at the Terrien home.

[24] The record indicates that the Terrien home was "a large estate" and that the library of the home was "in another section of the house" from where Terrien was watching television that night.

[25] The petitioner argues generally in an introductory section of his brief that counsel has a duty to investigate. He also argues that counsel's duty to investigate is not governed solely by the information provided by a client because counsel has an independent duty to explore potential defenses and favorable witnesses. In this regard, the petitioner cites *Rompilla* v. *Beard*, 545 U.S. 374, 377, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), for the proposition that "the United States Supreme Court firmly and explicitly established . . . that [an] attorney must go beyond what his client advises him in order to comply with the requirements of effective representation guaranteed by the sixth amendment." *Rompilla*, however, was not a case involving counsel's failure to investigate an alibi witness or, for that matter, any type of witness,

and, thus, is not applicable in the present context. In *Rompilla*, the petitioner's attorneys made limited efforts to obtain additional mitigation evidence concerning the petitioner's childhood after he advised them that his childhood was "unexceptional . . . ." Id., 379. Evidence in the habeas proceeding, however, established that, if the petitioner's counsel had reviewed a file in the prosecution's possession concerning a prior conviction, which the prosecution intended to use to establish an aggravating factor, counsel would have uncovered leads that would have led to substantial evidence that the petitioner had a terrible childhood, which could have been presented as mitigation evidence. See id., 383–84. The court in *Rompilla* thus determined that counsel was ineffective because, "once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents; and once having done so, [counsel] could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected." Id., 391 n.8. Accordingly, *Rompilla* stands for the proposition that counsel has a duty to review information he knows the prosecution has and intends to introduce at trial, and that case is not directly applicable to counsel's duty to investigate potential alibi witnesses. See id., 377; see also *Hannon* v. *Secretary, Dept. of Corrections*, 562 F.3d 1146, 1155 (11th Cir.) ("*Rompilla* requires 'reasonable efforts to obtain and review material counsel knows the prosecution will probably rely on as evidence' "), cert. denied sub nom. *Hannon* v. *McNeil*, 558 U.S. 997, 130 S. Ct. 504, 175 L. Ed. 2d 358 (2009).

[26] The club used in the murder was not a driver.

[27] Sherman's investigator testified at the habeas trial that he had been told by the investigator who found the witnesses after trial that it was one of the most difficult assignments he had ever conducted. One of the witnesses was out of the country during the relevant time period and another had the same name as thousands of individuals.

[28] In its memorandum of decision, the habeas court appears to have presumed that Sherman did not make any effort to pursue the witnesses that Coleman named, but that presumption is unsupported by the record at the habeas trial; the evidence is in fact to the contrary. The only evidence in the habeas record relating to whether Sherman pursued these witnesses indicates that he *did* make efforts to look for them, although we do not know what those efforts were. Even if the habeas court had discredited this testimony, it was not at liberty to reach an opposite finding without some evidence from the petitioner to show that Sherman had, in fact, decided not to look for them. See *State* v. *Hart*, 221 Conn. 595, 605, 605 A.2d 1366 (1992) ("[w]e have consistently stated . . . that [a fact finder] may not infer the opposite of a witness' testimony solely from its disbelief of that testimony"). Thus, even if the habeas court discredited the uncontradicted testimony of Sherman, Throne, and the investigator, it would be left without any evidence concerning whether Sherman searched for these witnesses and would be able to conclude only that the petitioner had not sustained his burden of proof.

[29] The habeas court also noted that Sherman could have used police reports to rebut another aspect of the state's argument at trial. According to the habeas court, the state argued at the petitioner's criminal trial that Elan staff members must have learned about the petitioner's potential involvement in the murder through the petitioner or his family because the police never had contact with Elan staff. The habeas court noted that some of the police reports indicate that investigators had spoken with Elan staff about the petitioner's presence there and determined that Sherman should have used these reports to rebut the state's argument that these contacts never occurred. We disagree, however, because the state did not argue that the police had *no* contact with Elan staff. Instead, the state argued that the police did not disclose any details about the investigation or the petitioner's potential involvement to Elan staff. This argument was supported by testimony from one of the police investigators, who testified that the police had not shared any details of their investigation with Elan staff and that the petitioner was not considered a suspect at the time he was at Elan.

[30] There were no questions posed to Sherman concerning the police report referencing the DUI charge, likely because the petitioner did not include a claim in his habeas petition about Sherman's handling of the evidence concerning why the petitioner was sent to Elan. During the habeas trial, habeas counsel nevertheless asked Sherman why he had not presented testimony from other witnesses to rebut the state's evidence that the petitioner was sent to Elan because of the murder, but did not specifically ask him about why he chose not to present evidence concerning the DUI charge.

The respondent's counsel asked follow-up questions about witnesses that Sherman could have called, but also did not discuss the police report. After the habeas trial, the habeas court found the police report referencing the DUI charge when reviewing documents in the record and inquired of counsel whether it related to any of the claims in the habeas petition. The court ultimately determined that the petitioner had failed to plead a claim concerning Sherman's handling of evidence relating to the petitioner's enrollment at Elan but that the issue was properly before the court because both the petitioner's counsel and the respondent's counsel had asked questions on this issue during the habeas trial.

[31] To protect the identities and privacy interests of jurors, we refer to B.W. by his first and last initials. See, e.g., *State* v. *Peeler*, 267 Conn. 611, 620 n.9, 841 A.2d 181 (2004).

[32] We do note, however, that the habeas court's determination that the petitioner failed to show that Sherman could have successfully suppressed the recordings calls into question the habeas court's determination that Sherman nevertheless was required to seek suppression of them in the first place. If the efforts were unlikely to succeed, then Sherman might reasonably have determined that attempting to suppress the recordings was not worth the resources that would have been expended in doing so.

[33] Courts have questioned whether the government can rely on a subpoena to establish the inevitable discovery exception to the exclusionary rule when, unlike in the present case, the subpoena was issued *after* the illegal police activity occurred and may have been based on information discovered through the illegal activity. See, e.g., *United States* v. *Vilar*, 729 F.3d 62, 85 (2d Cir. 2013), cert. denied,       U.S.     , 134 S. Ct. 2684, 189 L. Ed. 2d 230 (2014). There is no dispute in the present case that the grand jury subpoena was issued before Garr seized the recordings from Hoffman.

[34] In seeking a new trial on the basis of Sherman's purportedly deficient performance, the petitioner also asserts that, even if any one of his claims of prejudice alone is not sufficient to meet his burden, we should aggregate the harm caused by Sherman's errors to find that those errors, considered together, prejudiced the petitioner. We do not consider this argument, however, because, even if we did recognize the cumulative error theory, as the petitioner asserts—a question that we have not previously addressed directly—the petitioner still cannot prevail on his claims.

With respect to most of the petitioner's ineffective assistance claims, we have determined that the petitioner failed to prove the first element of the *Strickland* standard, namely, that Sherman performed deficiently. See parts II B and C, and III B, D and E of this opinion. Because the petitioner did not prove that Sherman committed any error in the context of these claims, the claims necessarily must be rejected, and there is no need to address whether the alleged errors, considered together, caused the petitioner prejudice.

With respect to the other ineffective assistance claims presented by the petitioner, we have not considered Sherman's performance because it was evident from the record and the habeas court's decision that, even if Sherman had performed deficiently, any alleged error caused no harm to the petitioner's defense. See parts III A, C and F of this opinion. Accordingly, there is no harm to aggregate when considering prejudice for these claims.

For example, the petitioner claimed that Sherman should have located and used a drawing of someone allegedly seen in the neighborhood of the crime scene on the night of October 30, 1975. But the habeas court determined that the drawing would have been of "no use" to the petitioner in implicating Littleton because police reports established that the drawing almost certainly depicted a local resident who had been seen in the neighborhood much earlier in the evening and who had nothing to do with the victim's murder. The petitioner also claimed that Sherman should have implicated two other individuals in the murder on the basis of information conveyed by Bryant, but the habeas court determined that the trial court would not have permitted the petitioner to raise a defense at trial based on Bryant's information, so the jury would never have heard this evidence. With respect to the petitioner's claim that Sherman should have presented expert testimony about the coercive nature of Elan's group meetings, the habeas court determined that this testimony "would not have been of particular use" in assessing the credibility of the evidence of the petitioner's private confessions to other residents of Elan, and the state conceded that the petitioner never confessed during any of the group meetings. Finally, with respect to the recordings seized from Hoffman, the habeas court concluded that the trial court would not have suppressed them, meaning that they

would have been admitted into evidence at trial regardless of whether Sherman had sought to exclude them. Because each of these alleged errors had *no* impact on the outcome of the trial, there is no harm to aggregate when considering the prejudice stemming from these alleged errors.

[35] The petitioner raised this claim in his cross appeal, but we instead treat it as an alternative ground for affirmance because the petitioner was not aggrieved by the decision of the habeas court. The habeas court vacated his conviction and ordered a new trial on other grounds, and that is precisely the same relief he seeks in connection with his conflict of interest claim. See *Sekor* v. *Board of Education*, 240 Conn. 119, 121 n.2, 689 A.2d 1112 (1997); see also *State* v. *Preston*, 286 Conn. 367, 373 n.4, 944 A.2d 27 (2008) (issue raised by nonaggrieved appellant treated as alternative ground for affirmance).

[36] We doubt that the petitioner established the existence of a conflict of interest sufficient to demonstrate a sixth amendment violation, substantially for the reasons advanced by the respondent's expert witness, Attorney Mark Dubois, during the habeas trial. As we explained, the IRS did not seize any of the funds that might have been needed for defense expenses, so no conflict ever materialized on that basis. With respect to the petitioner's claim that the flat fee agreement encouraged Sherman to avoid investing in the defense, the petitioner has provided no authority holding that this potential incentive amounts to a conflict of interest. Indeed, every billing arrangement between counsel and a client has some potential to create diverging interests between them. The petitioner presented no evidence to demonstrate that Sherman was actually conflicted because of this potential incentive not to spend funds on the defense. Nevertheless, we need not decide whether Sherman was burdened by a conflict because, even if he was, it is clear that the petitioner has not shown any prejudice.

[37] The respondent argues that the habeas court applied an incorrect standard for determining prejudice in connection with a conflict of interest claim of this kind in light of the United States Supreme Court's decision in *Mickens* v. *Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). The habeas court applied a less demanding prejudice standard from *Cuyler* v. *Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), but the respondent argues that, in light of *Mickens*, the standard set forth in *Cuyler* applies only to cases in which counsel represents more than one defendant and not to other types of conflicts, including when counsel has a personal conflict that burdens his representation of a client. In cases of personal conflicts, the respondent argues that the *Strickland* prejudice standard should control under *Mickens*. We need not address this argument, however, because it is clear that the petitioner's claim fails even under the less demanding standard set forth in *Cuyler*, which we have previously applied to similar claims. See, e.g., *Phillips* v. *Warden*, 220 Conn. 112, 133, 595 A.2d 1356 (1991).